USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ Nos. 93-1276 93-1576 UNITED STATES OF AMERICA, Appellant, v. NOEL FEMIA, Defendant, Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Torruella and Stahl, Circuit Judges, ______________ and DiClerico, Jr.,* District Judge. ______________ _____________________ Paula J. De Giacomo, Assistant United States Attorney, with ____________________ whom A. John Pappalardo, United States Attorney, and Heidi E. ___________________ _________ Brieger, Assistant United States Attorney, were on brief for _______ appellant. James E. Carroll, by Appointment of the Court, with whom _________________ John J. O'Connor and Peabody & Arnold, were on brief for _________________ __________________ appellee. ____________________ November 18, 1993 ____________________ ____________________ * Of the District of New Hampshire, sitting by designation. TORRUELLA, Circuit Judge. The government appeals from ______________ a district court pretrial order suppressing the testimony of its central witness in the prosecution of defendant-appellee Noel Femia for various drug crimes. We have jurisdiction under 18 U.S.C. 3731. The district court suppressed the testimony in order to remedy a perceived violation of Femia's due process rights, resulting from the government's allegedly grossly negligent destruction of tape recordings of conversations between the witness and other co-conspirators. For the reasons that follow, we reverse and remand with directions to vacate the suppression order. I I In the summer of 1985, the Drug Enforcement Administration ("DEA") entered an on-going investigation of a metropolitan Boston cocaine organization known as the "Triple X Public Service Corporation" ("Triple X"), which was being conducted by the Ashland, Massachusetts Police Department. The DEA recruited one of the three founding members of Triple X, Christopher LaPlante, who was also its bookkeeper, as a government informant in exchange for a plea agreement.1 LaPlante informed the DEA that Femia and co-conspirator Benhur Perea were the two suppliers of cocaine to Triple X. As part of the investigation, over a period of several months, LaPlante secretly tape-recorded conversations with various employees and ____________________ 1 The other two founders allegedly were Alan Stone and Edward Intinarelli. -2- customers of Triple X. In all, the government made twenty-four tape recordings of conversations between LaPlante and alleged co- conspirators or customers of Triple X (the "LaPlante tapes"). On October 3, 1986, a federal grand jury returned a multiple count indictment charging Femia with conspiracy to distribute cocaine, possession of cocaine with intent to distribute, and aiding and abetting, in violation of, respectively, 21 U.S.C. 846, 841(a)(1), and 18 U.S.C. 2.2 The indictment also charged eight other defendants and co- conspirators, whose cases are not part of this appeal, with various drug crimes. The government secured the conviction of the other eight defendants by trial or guilty plea in 1987. Femia remained a fugitive until July of 1992. The DEA prepared three files for the co-conspirators in the drug prosecution: one each for Perea, Femia, and Alan Stone, one of Femia's alleged co-conspirators. The LaPlante tapes were physically stored in Perea's file. The Perea file was cross- referenced to the Stone and Femia files. According to DEA Special Agent Albert G. Reilly, the cross-reference was intended to indicate that the cases were connected and that the evidence in each file pertained to the other cases. Apparently, it was the intent that an agent closing the Perea file would not order the routine destruction of evidence in the file until all cross- referenced cases were closed as well. ____________________ 2 A racketeering charge for violation of 18 U.S.C. 1962(c) was dismissed. -3- On October 8, 1987, a newly-assigned DEA agent, Albert Lively, authorized the destruction of all the LaPlante tapes contained in the Perea file. On that same day, Agent Lively made a notation in the Femia file that "this case is pending the arrest and prosecution of Femia." The government finally apprehended Femia in July of 1992. As a result of requests for information discoverable under Federal Rule of Criminal Procedure 16 and Brady v. Maryland, 373 _____ ________ U.S. 83 (1963), the government learned that the LaPlante tapes had been destroyed. Apparently, the destruction was a mistake that occurred because Agent Lively incorrectly failed to heed the cross-referencing notation linking the Perea file to Femia's file, which should have alerted him that the tape recordings in Perea's file were to be preserved pending the disposition of Femia's case. According to Agent Reilly, "[t]he fact that the tape recordings were destroyed was an inadvertent oversight caused by the three-part filing system that had been created." The district court specifically found that the government did not destroy the LaPlante tapes in bad faith, but rather, the destruction resulted from the government's gross negligence.3 The government, however, provided some information regarding seventeen of the twenty-four original tape recordings. Tapes and transcripts had been made for six of the recorded ____________________ 3 Whether this conduct can be described as "gross" negligence is not an issue before us and thus we express no opinion on this matter except to indicate that we will assume that the finding is appropriate for purpose of this appeal. -4- conversations (the DEA obtained copies of six of the original tapes from Perea's counsel).4 In addition, transcripts were made for two other tape recordings;5 no copies of these tapes are available, however. Finally, the government provided DEA Report No. 184, identifying the date, person recorded, and, with respect to some tapes, an extremely cursory description of the subject matter of the recorded conversation.6 Testimony concerning the tapes from Agent Reilly and Ashland Police Detective Thomas Kinder was also presented to the court. Agent Reilly contemporaneously monitored the recorded conversations and Detective Kinder reviewed the tapes. By affidavit, Detective Kinder explained that he transcribed seven of the tapes. Secretaries at the DEA typed his notes. He verified that the typed transcripts accurately matched his notes and again listened to tapes to confirm that each transcript was accurate and complete. Kinder stated that the DEA prepared the initial transcript of a conversation on February 13, 1986 (tape N-14). Because he was not satisfied with the DEA ____________________ 4 These recordings occurred November 5, 1985, February 13, 18, 27, 1986, and March 18 and 25, 1986. 5 These are transcripts of tape recorded conversation that occurred on February 4, 1986 and June 5, 1986. 6 These "summaries" are of limited utility; for example, some provide no information concerning the contents of the conversations and others merely indicate that the subjects engage in a "drug conspiracy conversion." The most detailed summary contains the unhelpful statement that the subject "admitted to transporting multi-kilos of cocaine from Florida to Massachusetts for Benhur Perea et al." The reports concern recordings that occurred on February 11, 1986, March 7 (two on this day), 11, 13 (two on this day), 18, and 25, 1986. -5- transcript version, he prepared a second transcript that he believed was accurate and complete. Agent Reilly's affidavit is to a similar effect. He stated that he listened to the conversations as they were recorded, determined that eight of the tapes were relevant to the investigation, and had those transcribed by the Ashland police. Although the DEA transcribed one of the tapes, Reilly had the Ashland police produce another version, believing that their knowledge of the central figures and events in the investigation would produce a more accurate and complete transcript. Both Kinder and Reilly explained in their affidavits that they had listened to each of the sixteen tapes which were not transcribed and determined that, given the investigation's limited resources and their opinion that the tapes contained general conversations that were not specifically relevant to the core of the Triple X investigation, those tapes should not be transcribed. Both asserted that none of the sixteen tapes contained any reference to Femia or his code names or numbers. ___ Agent Reilly indicated that he would have ordered transcripts made of any conversation in which references were made to Femia. Femia filed a motion to dismiss the indictment, or in the alternative, to suppress the testimony of the government witness, LaPlante, arguing that the destruction of the LaPlante tapes denied him of material exculpatory evidence in violation of Brady and its progeny. After a suppression hearing, the district _____ court denied the motion to dismiss, but granted the motion to -6- suppress. This appeal followed. -7- II II In this case we consider the constitutional ramifications of the destruction by the government of original tape recorded evidence pertaining to a criminal defendant's case. It is axiomatic that Brady and its progeny established _____ that a defendant has a due process right to request and receive evidence that the government possesses which is material to his guilt or punishment. Id., 373 U.S. at 87. The Constitution, ___ however, does not require a prosecutor "routinely to deliver his entire file to defense counsel." United States v. Agurs, 427 ______________ _____ U.S. 97, 111 (1976). In recent years the Supreme Court has developed a framework to analyze "what might loosely be called the area of constitutionally guaranteed access to evidence." California v. Trombetta, 467 U.S. 479, 485 (1984) and Arizona v. __________ _________ _______ Youngblood, 488 U.S. 51, 55 (1988) (each quoting United States v. __________ _____________ Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). The Supreme _________________ Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. Brady and its progeny _____ address exculpatory evidence still in the government's possession. Youngblood and Trombetta govern cases in which the __________ _________ government no longer possesses the disputed evidence. The standards established by the Supreme Court to deal with evidence that the government has lost or destroyed reflect, in part, "the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight." Trombetta, 467 U.S. at 486. As the Court stated in Trombetta, _________ _________ -8- "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Id. The Court's pronouncements also demonstrate respect for the ___ difference between nondisclosure cases, which involve known _____________ _____ quantities of evidence and in which a new trial may be ordered; and missing evidence cases, which implicate only potentially _________________ ___________ exculpatory evidence and in which the possible remedies are dismissal or suppression of the state's most probative evidence. See id. at 486-87. ___ ___ Trombetta and Youngblood together established a _________ __________ tripartite test to determine whether a defendant's due process rights have been infringed by law enforcement's failure to preserve evidence. See Griffin v. Spratt, 969 F.2d 16, 21 (3d ___ _______ ______ Cir. 1992); Jones v. McCaughtry, 965 F.2d 473, 476-77 (7th Cir.), _____ __________ cert. denied, 113 S. Ct. 360 (1992); United States v. Rastelli, ____________ ______________ ________ 870 F.2d 822, 833 (2d Cir.), cert. denied, 493 U.S. 982 (1989). ____________ In Trombetta, the Court established two hurdles that a _________ defendant must surpass to show a constitutional violation for missing evidence. The court stated: Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably -9- available means. Trombetta, 467 U.S. at 488-89.7 In Youngblood, the Court later _________ __________ added a third element when it held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of the law." Id., 488 U.S. at 58. A __ defendant who seeks to suppress evidence formerly in the government's possession therefore must show that the government, in failing to preserve the evidence, (1) acted in bad faith when it destroyed evidence, which (2) possessed an apparent exculpatory value and, which (3) is to some extent irreplaceable. Thus in missing evidence cases, the presence or absence of good or bad faith by the government will be dispositive. Femia contends that the missing evidence test created by Youngblood and Trombetta is inapplicable to his case and that __________ _________ the district court properly suppressed LaPlante's testimony as required by Brady.8 The thrust of Femia's argument, we gather, _____ is that the Youngblood analysis only applies to evidence "of __________ which no more can be said than that it could have been subjected to tests, the results of which might have exonerated defendant." Id., 488 U.S. at 57. Here, because defendant requested and the ___ ____________________ 7 Although Trombetta discussed the constitution's requirements _________ with respect to state law enforcement, it applies equally to federal agencies. 8 We note that applying a Youngblood rather than a Brady __________ _____ analysis places a substantially greater burden on the defendant in that he must demonstrate bad faith by law enforcement officials. Accord United States v. Caicedo-Llanos, 960 F.2d ______ _____________ ______________ 158, 161 (D.C. Cir. 1992). -10- government did not furnish evidence that the district court found to be material exculpatory evidence, Femia contends that Brady _____ established and Youngblood confirmed that such evidence must be __________ excluded, irrespective of the good or bad faith of the government. See Brady, 373 U.S. at 87; Youngblood, 488 U.S. at ___ _____ __________ 57. Femia asserts that the record evidence fully supports the district court's conclusion that the LaPlante tapes constituted material exculpatory evidence. The district court found that the LaPlante tapes very likely could be used to impeach LaPlante; second, the tapes, at least those whose contents are discernible from transcripts or copies, contained statements that directly exculpate the defendant; and third, because the tapes implicated other individuals in crimes alleged to have been committed by Femia, they could be used to create reasonable doubt.9 The district court appears to have treated the LaPlante tapes as a monolithic whole rather than distinguishing between those tapes for which evidence of their contents exists and tapes for which no copies or transcripts were made. As a result, the district court incorrectly applied Youngblood. Because the __________ Supreme Court has prescribed different due process standards for different types of nondisclosed evidence, we categorize each piece of evidence and separately discuss our resolution under the ____________________ 9 The district court had no basis to make a factual determination regarding the exculpatory value of tapes or portion of tapes concerning which it had no concrete evidence. -11- appropriate due process standard. We apply Youngblood to __________ evidence which no longer exists and Brady to exculpatory evidence _____ in the government's possession. In this case, we find no due process violation with respect to evidence that no longer exists because it was not destroyed in bad faith. As a result, the district court improperly suppressed LaPlante's testimony on the basis of this missing evidence. With respect to evidence that exists, we find that the government complied with its obligation under Brady, it _____ disclosed the evidence. Thus, to the extent that the district court suppressed LaPlante's testimony based on a perceived violation of Brady, it erred.10 _____ We begin then by analyzing the six LaPlante tapes for which copies were made and provided to Femia after being obtained from Perea's counsel. Femia claims and the district court found that these tapes contain material exculpatory evidence.11 Femia argues that because the copies cannot serve as a reasonable substitute for the originals -- he allegedly cannot verify their authenticity or ensure that no tampering has occurred -- the district court properly suppressed LaPlante's testimony to remedy ____________________ 10 The characterization of evidence as either in existence or no longer existing is a factual determination. The record is clear as to which pieces of evidence presently exist. 11 For example, one of the transcripts of the February 13, 1986 tape indicates that the original tape apparently contains exculpatory material. The tape records a conversation between LaPlante, Stone, and two others. On that tape, Stone apparently states: "He's [Benhur Perea] the only one bringing coke in the area, brother. He was the only one. Him and Noel [Femia], man. Noel, Noel don't do nothing no more." -12- the government's failure to disclose material exculpatory evidence. We disagree. No Brady violation has occurred with respect to the six _____ LaPlante tapes that were copied because Femia requested and received copies of these tapes prior to trial. It is true, as Femia contends, that the six copies may have been altered, damaged, or inexpertly copied from the originals. We will never know, however, with any degree of certainty whether the copies are entirely accurate reproductions of the originals.12 With respect to fragments of the original tapes that may have been irretrievably lost, we can say no more than that those fragments might have contained material exculpatory evidence. These allegedly missing fragments, like the breath and semen samples at issue in Trombetta and Youngblood, can only be characterized as _________ __________ potentially exculpatory evidence.13 In this circumstance, having shown no bad faith by the government, the possibility that the copies of the tapes may have been altered, or segments of tape may have been deleted, provides no basis for finding a due process violation. ____________________ 12 If, for some reason, Femia could not use the six copies of these tapes in his defense, we would be confronted with a situation in which we knew of the existence of material exculpatory evidence that the government failed to tender. Under those circumstances, it is quite likely that a Brady violation _____ would exist and would warrant granting the defendant's motion to suppress evidence. 13 The scientific tests required to determine exculpatory value involved in Trombetta and Youngblood provide no relevant _________ __________ distinction. In those cases, some scientific analysis of the disputed evidence was required. Here, someone had to listen to the allegedly missing fragments to determine exculpatory value. -13- We consider next the tapes for which Femia only possesses a transcript. Femia complains that the transcripts are of poor quality. He points to the great discrepancy between the DEA transcript of the February 13, 1986 tape (tape N-16) and the Ashland police version as proof that the transcripts do not reflect important material evidence. The loss of the audio portion and of the statements that were negligently not transcribed by law enforcement agents presents the same situation as the case in which missing fragments of conversation may have been lost when the six other tapes were copied. We do not know, and never will know, the content of statements that may have been lost. Contrary to the district court's decision, no due process violation has occurred. The government has disclosed the transcript evidence allegedly possessing exculpatory value, as required by Brady and its progeny. The lost audio portion and _____ statements not transcribed are only potentially exculpatory, and the failure to retain that evidence does not violate Femia's due process rights because the government did not destroy the evidence in bad faith. Youngblood, 488 U.S. at 58. __________ With respect to those LaPlante tapes for which only DEA Report No. 184 summaries exist and the tapes for which no record of content exists, the district court clearly erred in finding a due process violation because these tapes were destroyed due to the government's gross negligence, not bad faith. Id. ___ While the failure to demonstrate that the missing evidence in this case was destroyed in bad faith is sufficient to -14- reverse the district court, we note that Femia has not met Trombetta's materiality requirement for the missing evidence. To _________ satisfy Trombetta's constitutional materiality standard, _________ "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Trombetta, 467 _________ U.S. at 488-89. The evidence before the district court showed that any missing evidence -- whether one considers allegedly missing fragments of the tapes for which copies exist or those tapes which no longer exist in any form -- did not possess exculpatory value apparent before law enforcement destroyed the _______________ tapes. Agent Reilly and Detective Kinder provided affidavits stating that the destroyed tapes contained no references to Femia, his code names or numbers. Agent Reilly also explained that any tape containing references to Femia would have been transcribed. The district court presumably would have found the destruction to have been in bad faith if it did not credit Reilly and Kinder's evidence and if the exculpatory value was apparent before the destruction of the tapes. Youngblood, 488 U.S. at 56 __________ n.* ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."). However, no bad faith finding was made by the district court. Femia therefore did not establish the constitutional materiality of the lost evidence -15- required to demonstrate a due process violation. We reverse and remand with directions to vacate the _______ ______ suppression order. -16-