**Ted OTSUKI, Petitioner,**

v.

**Larry DUBOIS, Respondent.**

**Civil Action No. 97–10753–JLT.**

United States District Court,
D. Massachusetts.

Feb. 5, 1998.

Ted Otsuki, South Walpole, MA, pro se.

Cathryn A. Neaves, Attorney General's Office, Boston, MA, for Defendant.

### ORDER

TAURO, Chief Judge.

The court hereby orders as follows:

1. The court adopts and approves Magistrate Judge Marianne Bowler's Report and Recommendation, dated November 4, 1997;

2. Petitioner's Application for a Writ of Habeas Corpus (Docket # 5) is DENIED; and

3. Petitioner's Motion for a One Year Stay of Proceedings to Allow Exhaustion of More Serious Federal Claims, Renewed Request for Assignment of Counsel, and Leave to Late File Included Preliminary Reply to the Respondent's Opposition to Habeas Corpus is DENIED.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION RE: PETITIONER'S WRIT OF HABEAS CORPUS

### (DOCKET ENTRY # 5)

Nov. 4, 1997.

BOWLER, United States Magistrate Judge.

On March 31, 1997, Ted Jeffrey Otsuki ("petitioner") filed this *pro se* petition for a

writ of habeas corpus. (Docket Entry # 5). The matter was referred to this court on May 20, 1997, for issuance of a report and recommendation. (Docket Entry # 7). Respondent Larry Dubois ("respondent") filed an Answer and a Supplemental Answer to the petition on July 15, 1997. (Docket Entry # 13, 14). This court issued an Order on August 7, 1997, requiring respondent to file an opposition to the petition by September 3, 1997, and also allowing the parties leave to request an evidentiary hearing if so desired. (Docket Entry # 15). Neither party requested such a hearing and respondent filed a Memorandum Of Law In Opposition To The Petition on September 3, 1997. (Docket Entry # 17).

### PROCEDURAL BACKGROUND

On May 16, 1989, following a three week jury trial, petitioner was convicted of: first degree murder of Boston Police Officer Roy Sergei ("Officer Sergei"), assault with intent to murder Officer Jorge Torres ("Officer Torres"), assault and battery upon Officer Torres by means of a dangerous weapon, assault upon Officers Christopher Rogers ("Officer Rogers") and William Kennedy ("Officer Kennedy") by means of a dangerous weapon and unlawfully carrying a firearm. (Tr. at 14–18–23).

Petitioner received a mandatory natural life sentence for the first degree murder conviction. (Tr. at 14–33). The trial court sentenced petitioner to 19 to 20 years for the assault with intent to murder conviction, to run concurrently with the life sentence. (Tr. at 14–34–35). On his conviction for assault and battery by means of a dangerous weapon on Officer Torres, petitioner received a sentence of nine to ten years, to run consecutively to the sentence for assault with intent to murder. (Tr. at 14–35). Petitioner also received a four to five year sentence for each of the following: assault by means of a dangerous weapon on Officer Rogers, assault by means of a dangerous weapon on Officer Kennedy and carrying a pistol without a license. (Tr. at 14–35–36). The trial court

ordered these sentences to run concurrently with the life sentence. (Tr. at 14–36).

On November 18, 1991, the Supreme Judicial Court of Massachusetts ("SJC") affirmed petitioner's convictions. *Commonwealth v. Otsuki*, 411 Mass. 218, 581 N.E.2d 999 (1991). On March 31, 1997, petitioner filed this petition for a writ of habeas corpus.

In his application to this court, petitioner raises the following four grounds: (1) that his convictions were "obtained in violation of [the] sixth and 14th Amendments through prejudicial jury empanelment· procedures;" (2) that his convictions were "obtained in violation of [the] 14th Amendment by prosecutor's" failure to produce vital ballistic evidence; (3) that his convictions were obtained "in violation of [the] 14th Amendment" by the Commonwealth's introduction of "massive, prejudicial, prior bad acts evidence;" and (4) that his convictions were obtained "in violation of [the] 14th Amendment by [the use of] oversuggestive, unreliable single photo identification procedures." (Docket Entry # 5, ¶ 12(a)–(d)).

After reviewing the petition and memoranda submitted by the parties and for reasons stated below, this court finds no merit in petitioner's claims.

### NECESSITY OF AN EVIDENTIARY HEARING

■ Neither party requested an evidentiary hearing before this court. Nor is it necessary to conduct one in the case at bar.

The Anti-terrorism and Effective Death Penalty Act ("the AEDPA"), codified in part in 28 U.S.C. § 2254(e), alters the standard for determining the necessity for an evidentiary hearing. The strong presumption in favor of state court findings that previously existed under 28 U.S.C. § 2254(d) is even stronger under the reformulated provisions of the AEDPA, 28 U.S.C § 2254(e)(1) and (2). The current habeas statute, however, instead of providing for an evidentiary hearing if the petitioner meets one of eight conditions,[1] now only refers to the holding of a

---

**1.** The former 28 U.S.C. § 2254(d) provided for an evidentiary hearing when the petitioner established one of the following eight conditions:

(1) that the merits of the factual dispute were not resolved in the State court hearing;

hearing in subsection (e)(2) in the following language:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> > (A) the claim relies on—
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (1996).

Courts and commentators disagree as to the import of this section. A number of courts hold that the above standard only applies to those petitioners who have not established the factual basis of their claims in state court. Those courts continue to use the pre-AEDPA or *Townsend/Keeney* standard[2] for determining when an evidentiary hearing is necessary for those petitioners who did develop the factual basis of their claims, *see, e.g., Burris v. Parke*, 116 F.3d 256, 258–259 (7th Cir.1997) (illustrating difference between new § 2254(e)(2) and former *Townsend/Keeney* standard in that § 2254(e)(2) only applies to the situation where the petitioner failed, by omission, to develop the factual basis of

the claim in state court); *Spreitzer v. Peters*, 114 F.3d 1435, 1456–1457, n. 10 (7th Cir.1997) (employing the *Townsend* analysis and stating that when the facts needed to adjudicate the constitutional claim are before the court, an evidentiary hearing is not necessary); *Porter v. Gramley*, 112 F.3d 1308, 1316–1317, n. 8 (7th Cir.1997) (declaring that before and after the AEDPA, federal courts presume state court findings of fact to be correct for habeas purposes, but that a petitioner faces a more difficult burden in procuring an evidentiary hearing under the AEDPA); *Brewer v. Marshall*, 941 F.Supp. 216, 228–29 (D.Mass. 1996), *rev'd in part*, 119 F.3d 993 (1st Cir. 1997) (the limitations on evidentiary hearings contained in the AEDPA are only relevant to the petitioner who fails to develop the factual record in state court). *But see*, Note, *Rewriting the Great Writ: Standards of Review for Habeas Corpus Under the New 28 U.S.C. § 2254*, 110 Harvard L.Rev. 1868, 1875 (1997) (stating that there are two possible readings of § 2254(e)(2); first, that the section refers only to cases where the "factual bases underlying a claim have not been developed," or second, that the provisions alone "occupy the field" and that an evidentiary hearing is therefore unnecessary for claims whose factual bases are developed); Larry W. Yackle, *A Primer on the New Habeas Corpus Statute*, 44 Buffalo L.Rev. 381, 388–390 (1996) (asserting that the possibility of a federal evidentiary hearing is limited to those petitioners who can show that facts were not developed in state court, *and* that a "reasonable" jury would have found a defendant innocent because of those facts) (emphasis added).

---

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction ... in the State court proceeding;

(5) that the applicant was an indigent and the State court ... failed to appoint counsel to represent him in the state proceeding;

(6) that the applicant did not receive a full, fair and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or [the federal court decides that the record does not support the factual determination(s) made by the state court].

28 U.S.C. § 2254(d) (1994).

**2.** The *Townsend* standard stems from the Supreme Court's decision in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled in part by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), where the Court established a six-part test later codified in 28 U.S.C. § 2254(d). *Keeney* overruled the fifth factor of the *Townsend* test which was factor three under the old § 2254(d). *Keeney*, 504 U.S. at 5; 28 U.S.C. § 2254(d)(3) (1994).

This court finds an evidentiary hearing unnecessary under any of the aforementioned standards. The facts raised by petitioner are not new and have been fully litigated in state court proceedings. Petitioner has not rebutted the findings of the state court by clear and convincing evidence sufficient, under the newly amended § 2254(e), to require an evidentiary hearing. Even under the *Townsend* test, petitioner cannot meet any of the conditions which would warrant an evidentiary hearing.

Accordingly, in light of the fact that neither party requested a hearing, and considering the lack of factual dispute in the petition, this court will not conduct an evidentiary hearing.

### FACTUAL BACKGROUND

The state court record, including the trial record and the opinion rendered by the SJC,[3] shows the following facts.

On September 28, 1987, petitioner rented an apartment at 371 Commonwealth Avenue in Boston, Massachusetts. (Tr. at 3–189).[4] On October 2, 1987, at approximately 1:00 a.m., police were summoned to 371 Commonwealth Avenue in response to a suspected assault on a female tenant of that building. (Tr. at 4–124–125). Officers Sergei and Kennedy were first to arrive, followed shortly thereafter by Officers Torres and Rogers. (Tr. at 4–125). Officers Torres and Rogers, after proceeding to the rear of the building, saw petitioner who had apparently jumped from the building and landed in the courtyard next to the alley behind the building. (Tr. at 4–131).

Officer Torres ordered petitioner to climb over a chain-link fence that separated him from the officers and proceeded to "pat down" petitioner. (Tr. at 4–146). Petitioner then broke free from Officer Torres' grasp and shot him with a pistol, previously hidden under petitioner's jacket. *Id.* Officer Rogers pushed petitioner against a wall and sought cover behind a car parked in the alley. (Tr. at 5–31). Petitioner fired several times at Officer Torres as he chased him out of the alley and also fired several times back into the alley, in the direction of Officer Rogers. (Tr. at 5–33–34).

Officers Kennedy and Sergei, who were attempting to enter the building through the front entrance, heard the shots and came around to the back of the building. (Tr. at 5–117). At the mouth of the alley, behind the building, Officer Sergei encountered petitioner who looked at him, hesitated, and then fired "at least five" shots. (Tr. at 4–151; 5–126). Three of the shots struck Officer Sergei. (Tr. at 6–49). Officer Sergei fell to the ground and petitioner fled. (Tr. at 4–151; 5–120–121). Officer Kennedy fired a shot at the fleeing suspect and, after chasing petitioner a short distance, tended to his injured partner. (Tr. at 5–121–125).

Paramedics transported Officers Sergei and Torres by ambulance to Brigham and Women's and Boston City Hospitals respectively. (Tr. at 5–165; 5–180). Officer Torres required extensive medical care, but did recover from his injuries. (Tr. at 6–30).

Officer Sergei suffered bullet wounds to his right chest, right flank and right buttock. (Tr. at 6–49–50). The bullet which entered through his right flank also went through his spinal cord. (Tr. at 6–55–56). At Brigham and Women's, Officer Sergei underwent surgery to remove bullet fragments from the bullet which entered his chest and became lodged under his skin. (Tr. at 6–8–9; 6–55). After that procedure, the registered nurse on duty placed the fragments in a plastic container and took them to the admitting office at the hospital. (Tr. at 6–14). There, the admitting supervisor locked the fragments in a file cabinet for later collection by the police. *Id.* Police personnel did not pick up the evidence and the fragments were subsequently lost. (Tr. at 6–22). After spending approximately three weeks at Brigham and Women's Hospital, on October 26, 1987, Offi-

---

**3.** As indicated in respondent's brief, the new law governing habeas corpus proceedings, formulated in the AEDPA, and codified in the newly amended 28 U.S.C. § 2254, requires the reviewing court to presume as correct state courts' findings of fact, unless rebutted by the applicant by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (1996).

**4.** Citations are to the state court record.

cer Sergei died as a result of a pulmonary embolism caused by complications stemming from the injury to his spinal cord. (Tr. at 6–55–66).

During jury selection, the defense proffered a list of 32 questions to be submitted to the venire in an attempt to determine bias or prejudice on the part of the venire members. (Tr. at 1–12–14). One of the 32 questions was specifically aimed at eliciting racial prejudice.[5] The trial court initially refused to submit the list of questions and instead asked the venire a general question regarding prejudice.[6] After determining that petitioner was Asian, the trial court reconsidered its decision and offered to ask the now empaneled jury the race question as drafted by defense counsel, couched with another question. (Tr. at 3–4; 3–47). Defense counsel rejected this offer, claiming that it was "too late" and the question at that point would only inflame and entrench any racial bias or prejudice already existent among the jury members. (Tr. at 3–41).

At trial, the prosecution presented testimony from several witnesses in an attempt to shed light on petitioner's activities before and after the crime and his motive to commit the crime. The Commonwealth's witness, James Burkhart ("Burkhart"), testified on cross-examination that he was to retrieve a car petitioner left for him that contained a myriad assortment of weapons. (Tr. at 8–30–33). The Commonwealth also offered evidence of petitioner's prior convictions and parole status at the time of the crime. (Tr. at 5–94–101). Petitioner's Federal Parole Officer, Adolph Betancourt ("Betancourt"), testified that petitioner was wanted in Texas for a parole violation and that petitioner was aware of that fact. (Tr. at 5–99–100). According to Betancourt, petitioner was also aware of the consequences of avoiding his parole obligations, specifically that petitioner's sentence would be reimposed in the event of a parole violation. *Id.* San Francisco Police Sergeant Greg Lynch ("Sergeant

Lynch") recalled that he saw petitioner outside a San Francisco movie theater approximately one month before the crime, carrying a nine millimeter "blue steel" gun. (Tr. at 9–76). According to Sergeant Lynch, that gun was, with the exception of color, substantially similar to the one used by petitioner to perpetrate the present crime. (Tr. at 9–85; 9–89).

Petitioner repeatedly objected to the introduction and admission of this evidence but the trial court overruled petitioner's objection in each instance. (Tr. at 3–17–20; 5–94–95; 11–106–117; 9–75; 9–87).

Finally, the Commonwealth presented in-court identifications of petitioner by Officer Rogers and Jennifer Zetzer ("Zetzer"). (Tr. at 4–231; 5–39–40). Neither Officer Rogers nor Zetzer had previously identified petitioner to the police by means of a line-up or photo array. Officer Rogers, however, recognized petitioner in court from a wanted poster he had seen in the police department one week after the shootings. (Tr. at 5–39). Zetzer stated that she recognized petitioner from both a picture she saw in a local newspaper shortly after the time of the events and from seeing petitioner fleeing the area of the crime on October 2, 1987. (Tr. at 4–228–231; 4–236).

## DISCUSSION

### A. Standard of Review under 28 U.S.C. § 2254

The AEDPA, effective April 24, 1996, alters the standard of review for claims arising under 28 U.S.C. § 2254. Specifically, the AEDPA creates a new section, which states in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

---

5. The proposed question was as follows: "Do you have any biases or prejudices based upon or against persons of [O]riental or Asian extraction?" (Tr. at 2–136).

6. The trial court posed the following question to the venire: "[a]re any of you aware, sensible of any bias or prejudice in relation to the defendant, the Commonwealth or any of the possible witnesses in this case?" (Tr. at 1–31–32).

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (1996).

Cases in the First Circuit that have discussed and approved this new standard include *Curtis v. Duval*, 124 F.3d 1, 1997 WL 446878, at *2 (1st Cir. August 13, 1997) (stating that the AEDPA modifies the standard of review governing issuance of writs of habeas corpus), and *Martin v. Bissonette*, 118 F.3d 871, 874 (1st Cir.1997) (stating that the AEDPA alters "the legal framework which governs federal judicial review of habeas corpus applications"). Other circuits applying the new standards include the Sixth Circuit in *Harpster v.. Ohio*, 128 F.3d 322, 1997 WL 574899, at *3–5 (6th Cir. September 18, 1997), the Fifth Circuit in *Drinkard v. Johnson*, 97 F.3d 751, 768–769 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997) (defining "unreasonable application" in 28 U.S.C. § 2254(d)(1) as more than a "simple disagreement" between the federal court and the state court decision; and declaring that a federal court "can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists"), and the Seventh Circuit in *Lindh v. Murphy*, 96 F.3d 856, 871 (7th Cir.1996), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (stating that a state court decision that comes within the bounds of the limits set by the Supreme Court must be respected by the federal reviewing court).

Consequently, in order for petitioner to succeed on his petition for habeas corpus, he must show that the state court decision was contrary to, or involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." [7] 28 U.S.C. § 2254(d)(1).

### B. *Petitioner's Jury Selection Claim*

Petitioner's claim that the trial court violated his sixth and fourteenth amendment rights by its failure to ask the venire, during *voir dire,* questions regarding racial bias against Asians fails. The decision rendered by the state court was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

The Supreme Court held in *Ristaino v. Ross* that the trial court must conduct specific questioning of the venire, aimed at ferreting out racial bias, when "racial issues [are] inextricably bound up with the conduct of the trial." *Ristaino v. Ross*, 424 U.S. 589, 597, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *see also United States v. Brown*, 938 F.2d 1482, 1485 (1st Cir.), *cert. denied,* 502 U.S. 992, 112 S.Ct. 611, 116 L.Ed.2d 633 (1991) (holding that specific questioning on *voir dire* as to racial bias of the venire is not compulsory unless there is substantial evidence of the "likelihood of racial or ethnic prejudice"); *Sanders v. Fair*, 728 F.2d 557, 558 (1st Cir.), *cert. denied,* 467 U.S. 1254, 104 S.Ct. 3541, 82 L.Ed.2d 845 (1984). In *Ristaino* the Supreme Court, notwithstanding the fact that the defendant was an African–American male convicted of assaulting a white security guard, refused to find the circumstances necessary to compel the trial judge to inquire into the racial biases of the venire. The Supreme Court reasoned that the defendant was not singled out for arrest or prosecution because of his race. He just happened to be of a different race than the victim. *Ristaino,* 424 U.S. at 597.

The mere fact that the petitioner and the victims are members of different races does not implicate a constitutional imperative to ask the venire about racial bias. *Id.;* *Brown*, 938 F.2d at 1485; *Turner v. Murray*, 476 U.S. 28, 33, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). In *Turner*, the Supreme Court explained the analytical framework to consider when determining if questioning of the venire is mandatory: " '[T]he broad inquiry in each case must be . . . whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent

---

**7.** The above cases illustrate that appellate courts reviewing habeas cases may employ appellate decisions as well as Supreme Court decisions when determining what "clearly established federal law" is. *Drinkard,* 97 F.3d at 769; *Lindh,* 96 F.3d at 869–870.

questioning about racial prejudice, the jurors would not be as indifferent as [they stand] unsworne.'" *Turner*, 476 U.S. at 33.

In *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), the Supreme Court related the kind of circumstances that would mandate questioning of the venire to ensure that a jury remains "indifferent" and able to render an unbiased decision. In *Ham*, the defendant was an African–American civil rights activist whose defense at trial for drug possession was that because of his race and because of his civil rights activities, the police were "'out to get him.'" *Ham*, 409 U.S. at 525. The Supreme Court concluded that the police and prosecution targeted the defendant because of his race. Due to that fact, the fourteenth amendment's requirement of "essential fairness" warranted at least a general inquiry into the racial biases of the potential jurors. *Ham*, 409 U.S. at 527.

■ In the case at bar, the SJC found that since the targets of the crime "included two white men ... an Hispanic, and a black man ... it is hard to figure that the jury regarded the defendant's race as a significant factor in this case." *Commonwealth v. Otsuki*, 411 Mass. 218, 581 N.E.2d 999, 1005, n. 9 (1991). Indeed, the police were not "out to get" petitioner in this case. The police were not looking for an Asian male at all. They just happened upon petitioner in an alley while responding to a routine police call. It is significant that petitioner did not and does not claim that race was an important element of his case. Accordingly, it cannot be said that race was a significant factor in this case. Therefore, it was reasonable for the SJC to apply the *Ristaino* model to the facts of petitioner's case and to conclude that petitioner's constitutional rights were not

abridged by the trial court's failure to ask the venire about racial bias.

While petitioner in his brief to the SJC (his Substitute Memorandum Of Law to this court) cites both *Ham* and *Turner*, neither stand for the proposition that he posits. Petitioner claims that the failure of the trial court to ask the venire about racial bias was a violation of his "fundamental right to a fair trial." He specifically claims that an inquiry into the racial prejudice of the venire was, in the words of *Turner*, "minimally intrusive," and necessary since the potential existed for the jury to take the race of petitioner into consideration.

*Ham* is inapposite because the factors that compelled the *voir dire* in *Ham* are not present in petitioner's case. Indeed, petitioner does not argue the existence of any factors that would bring his case within the rubric of *Ham. Turner* is also inapplicable because the Supreme Court stated that although questioning was required in *Turner*, what set that case apart from *Ristaino* was the fact that, in *Turner*, "the crime charged was a capital offense."[8] *Turner*, 476 U.S. at 33.

The *Ham* case also provides that the trial court, even if required to ask questions designed to elicit racial bias from the venire, is not obligated to put those questions to the venire in any particular form. *Ham*, 409 U.S. at 527. Similarly, the trial court in the present case, even if compelled to ask questions, was not required to pose the questions as written by petitioner's trial counsel, and certainly could not be expected to ask 32 questions, only one of which was concerned with race. The SJC noted in its opinion that the trial court offered to ask a question concerning racial bias, even couched with another question, and it was petitioner who rejected this offer.[9] *Otsuki*, 581 N.E.2d at

8. The Supreme Court was explicit in *Turner*, holding that capital cases are unique and require a further inquiry into the racial biases of the venire. The Supreme Court found that the decision made by a jury during the penalty phase of a capital case differs from a determination of guilt in that the potential is greater, during the penalty phase, for outside factors, such as race, to affect the jury's conclusion. *Turner*, 476 U.S. at 33–34. The Supreme Court stated in a footnote that, "... we do not retreat from our holding in

*Ristaino*. The fact of interracial violence alone is not a special circumstance, entitling the defendant to have prospective jurors questioned about racial prejudice." *Id.* at 35, n. 7. Since this is not a case where death is a potential penalty, *Ristaino* is the relevant standard and petitioner's reliance on *Turner* is misplaced.

9. The colloquy between defense counsel and the trial court went as follows:

1006. Neither the prosecutor nor petitioner raised the race issue again in any form for the remainder of the trial.

Accordingly, petitioner cannot prove that race was an issue in this case. Consequently, the factors required to conduct *voir dire* on racial bias, as outlined in *Ham* and *Ristaino*, are not prevalent here. Petitioner fails to show that the trial court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme court of the United States; and for these reasons, petitioner's first claim fails.

### C. *Petitioner's Missing Ballistics Evidence Claim*

Petitioner's claim that the Commonwealth's failure to produce "vital ballistics evidence," specifically the bullet fragments removed from Officer Sergei, violated his fourteenth amendment rights is without merit because the trial court's determination of that issue was not contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

The Supreme Court has recently developed a framework in which to analyze the consequences of the failure of the police to preserve evidence. Numerous courts refer to this area of jurisprudence as "the area of constitutionally guaranteed access to evidence." *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Femia*, 9 F.3d 990, 993 (1st Cir.1993). The Supreme Court has established a tripartite test to determine when the

police's failure to preserve evidence runs afoul of the Constitution.

In *Trombetta*, the Supreme Court held that the police are required to preserve only that evidence which is material to the defendant's case. To be constitutionally material under *Trombetta*, the evidence must be apparently exculpatory before it is lost and "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488–89.

In *Arizona v. Youngblood*, the Supreme Court held that unless a criminal defendant shows bad faith on the part of the police or the prosecution, failure to preserve potentially useful evidence does not constitute a denial of due process. *Youngblood*, 488 U.S. at 58; *see also Femia*, 9 F.3d at 993 (holding that in "missing evidence cases," the good faith/bad faith question is "dispositive"). The Supreme Court emphasized that this is the standard that controls when the lost evidence is merely possibly exculpatory rather than clearly exculpatory.[10]

■ Taking *Youngblood* and *Trombetta* together, a defendant, in order to have evidence suppressed that the government has lost or destroyed, must show that the government, "(1) acted in bad faith when it destroyed evidence, which (2) possessed an apparent exculpatory value and, which (3) is to some extent irreplaceable." *Femia*, 9 F.3d at 993–94; *United States v. Lewis*, 40 F.3d 1325, 1340–41 (1st Cir.1994) (quoting *Femia*, and stating that where there is substantial evidence of guilt, merely alleging that the missing evidence would have implicated someone else does not make the evidence "material").

Court: ... I indicated that I wouldn't necessarily just ask that sole question nakedly ... I would couch it with another question so that it would mitigate the question somewhat.... Counsel: ... His (petitioner's) position is that unless it is couched in between *thirty* other questions, that it wouldn't serve any purpose at this point.
(Tr. at 3–47–48) (emphasis added).

10. As explained by the Supreme Court in *Youngblood* :

The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes

the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant.
*Youngblood,* 488 U.S. at 57; *Femia,* 9 F.3d at 994 (emphasis added).

The SJC, while not explicitly interpreting federal law,[11] did not render a decision that was contrary to or involved an unreasonable application of clearly established federal law. In deciding the question under its own three-prong test,[12] the SJC did not violate the standard promulgated in 28 U.S.C. § 2254(d)(1). Though the test used by the SJC, which is based on state law, is more favorable to petitioner than the federal test established in *Youngblood* and *Trombetta*, the SJC still determined that the failure of the Commonwealth to produce the missing evidence did not violate petitioner's constitutional rights. *Otsuki*, 581 N.E.2d at 1007.

The SJC found that the hospital staff, and not the police, was responsible for the loss. The testimony is uncontroverted that, after a doctor at Brigham and Women's Hospital removed the fragments from Officer Sergei, a nurse placed them in a container and took them to admitting for pickup by the police. They were *never retrieved and were* subsequently lost when Brigham and Women's moved its admitting department. Petitioner in his Substitute Memorandum Of Law nevertheless contends in a conclusory fashion that the hospital was an agent of the prosecution and that the prosecution is therefore responsible for the loss. Petitioner, however, offers no case law to bolster this proposition. Assuming that the hospital workers were agents of the prosecution, petitioner still cannot and does not indicate any actions taken by the hospital staff or the prosecution evidencing bad faith, a requirement that petitioner must meet to succeed on this claim. This court agrees with the finding of the SJC that the government never had possession of the lost bullet fragments and therefore could not have been acting in bad faith when it failed to turn the fragments over to petitioner. *Otsuki*, 581 N.E.2d at 1007.

The SJC also found that the missing evidence was not material to petitioner's case. "Substantial evidence" was introduced that established that the other bullets led to Officer Sergei's death, and those bullets could have come from petitioner's gun. *Id.* Petitioner did not introduce a single witness who could claim that the fragmented bullet was the one that caused officer Sergei's death. The most that could be said about the missing bullet fragments is that they might have been subjected to tests that might have shown that they might have come from a gun other than petitioner's. These fragments were certainly not "apparently exculpatory." Without more, this court agrees that the fragments were not material to petitioner's case.

Moreover, petitioner cites only a single case which employs a constitutional analysis of the present question: *United States v. Bryant*, 439 F.2d 642 (D.C.Cir.1971). *Bryant*, however, is no longer applicable in light of the Supreme Court's decision in *Youngblood. In re Sealed Case*, 99 F.3d 1175, 1178 (D.C.Cir.1996) (stating that on the question of the police's duty to preserve evidence, *Bryant* is no longer good law). Inasmuch as petitioner fails to show bad faith on the part of the Commonwealth in withholding the missing evidence, he cannot succeed on his claim.

In sum, the SJC's decision, while not explicitly relying on federal constitutional analysis, is not contrary to, nor does it involve an unreasonable application of, clearly established federal law, as defined by the Supreme Court of the United States. Accordingly,

---

11. Since 28 U.S.C. § 2254(b)(2) allows this court to deny an application for a writ of habeas corpus on the merits, notwithstanding the failure of the applicant to exhaust all available state remedies, it is unnecessary to decide the issue raised by the Commonwealth, to wit, whether petitioner has exhausted the present claim. Furthermore, the First Circuit has held that failure of a habeas petitioner to exhaust all state remedies does not necessarily bar a federal court from considering the unexhausted claims on the merits. *Gagne v. Fair*, 835 F.2d 6, 9 (1st Cir.1987). Although " 'there is a strong presumption in favor of requiring the defendant' " to fully exhaust his claims in state court, a strict application of the exhaustion principle "might simply require useless litigation in the state courts." *Id.* (quoting *Granberry v. Greer*, 481 U.S. 129, 131, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987); *Granberry*, 481 U.S. at 133).

12. The SJC considered, "(1) the Commonwealth's culpability as to the lost evidence; (2) the materiality of the lost evidence; and (3) the potential prejudice to the defendant as a result of the unavailability of the evidence." *Otsuki*, 581 N.E.2d at 1007.

petitioner's second ground of relief is without merit.

## D. *Petitioner's Prejudicial Evidence Claim*

Petitioner's claim that the admission into evidence of "bad acts," specifically the testimony of Sergeant Lynch and witnesses Burkhart and Betancourt, violated his fourteenth amendment rights fails because it is not based on any provision of federal constitutional law. Rather, petitioner's claim is based on an error of state law, not cognizable under 28 U.S.C. § 2254.

It is a long standing proposition that "[f]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (reversing appellate court's reversal of conviction, holding that a federal court deciding a habeas corpus petition cannot grant the writ based on an alleged error of state law, here the admission of certain evidence); *see also Hamm v. Latessa*, 72 F.3d 947, 954 (1st Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 154, 136 L.Ed.2d 99 (1996) (reaffirming *Estelle* and stating further that the proper function of a district court is not to "second-guess" the state court concerning the interpretation of state law). By its own terms, the habeas corpus statute embodied in 28 U.S.C. § 2254 only applies to errors of federal law. Subsection (a) states that "a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody *in violation of the Constitution or laws ... of the United States.*" 28 U.S.C. § 2254(a) (1996) (emphasis added).

Outside of this general prohibition against considering errors of state law on habeas review, the Supreme Court in *Lewis v. Jeffers* held that a federal court can review errors of state law only when the "state court's finding was so arbitrary or capricious as to constitute an independent due process ... violation." *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *accord Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (finding that a remark made by a prosecutor during closing argument inferring an admission of guilt by the defendant, while improper, was not so prejudicial as to violate due process); *Hamm*, 72 F.3d at 954 (holding that unless the application of state law by a state court violates the Constitution, the federal habeas court cannot disturb such application). Finally, Justice Thomas, writing in dissent in *Riggins v. Nevada*, points out that a reviewing court "may not reverse a state 'trial judge's action in the admission of evidence' unless the evidentiary ruling 'so infuse[s] the trial with unfairness as to deny due process of law.'" *Riggins v. Nevada*, 504 U.S. 127, 147, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (quoting *Lisenba v. California*, 314 U.S. 219, 228, 62 S.Ct. 280, 86 L.Ed. 166, (1941)).

Since petitioner alleges an error of state law as a ground for habeas relief, he must prove that the trial court's admission of the aforementioned "bad acts" and evidence of flight was so egregious as to "by itself so infect the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S at 71 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). Petitioner cannot make out this claim.

The SJC determined, after careful consideration, that the admission was not an abuse of the trial court's discretion. One of the stated reasons was that since the Commonwealth's case against petitioner was very strong, "the jury had abundant evidence to convict the defendant ... regardless of [the bad acts] testimony." *Otsuki*, 581 N.E.2d at 1010. The SJC considered the overwhelming evidence of petitioner's guilt, including ballistics evidence and eyewitness identifications, in making this determination. *Id.*

Moreover, the SJC agreed with the trial court's determination that the evidence served a proper purpose under state law, i.e., that of establishing motive (testimony regarding the implications of petitioner's parole violation, specifically his status as a fugitive and his subsequent flight) and means (testimony of Sergeant Lynch that petitioner had possession of a gun). *Otsuki*, 581 N.E.2d at 1009–1010. As to the evidence of other weapons left by petitioner in a car to be

picked up by Burkhart, the SJC found that, having opened the door by asking about those weapons on cross-examination, petitioner's "claim of prejudice [was] highly suspect." *Id.* at 1010.

This court agrees with the findings made by the SJC and therefore cannot find that the introduction of the evidence concerning "prior bad acts" caused petitioner prejudice. The trial court's admission into evidence of the "bad acts" testimony was not in violation of clearly established federal law, as determined by the Supreme Court of the United States, as it was not a question of federal law. Accordingly, because petitioner cannot establish that the admission into evidence of certain "bad acts" was in itself a due process violation, petitioner's third ground fails.

### E. *Petitioner's Suggestive Identification Claim*

Petitioner's claim that certain identifications, allowed into evidence by the trial court, were overly suggestive and deprived petitioner of his fourteenth amendment right to a fair trial fails because the state court did not render a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

Petitioner claims that the trial court should not have allowed the in-court identifications of petitioner made by Zetzer or Officer Rogers because their out-of-court identifications of him were so suggestive that they tainted and rendered unreliable the later in-court identifications.

■ The Supreme Court has established that the standard for admitting an in-court identification based on an out-of-court identification is the same as the standard for admitting the identification on which the in-court identification is based. Put simply, an in-court identification will be allowed unless its basis, the out-of-court identification, is impermissibly suggestive. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Maguire,* 918 F.2d 254, 264 (1st Cir.1990), *cert. denied,* 499 U.S. 950, 111 S.Ct. 1421, 113

L.Ed.2d 474, *reh'g denied,* 500 U.S. 938, 111 S.Ct. 2068, 114 L.Ed.2d 472 (1991).

■ The Supreme Court in *Simmons* established a two-pronged test to determine when out-of-court identifications made from suggestive confrontations may be admitted or excluded. *Maguire,* 918 F.2d at 263. First, a court must decide whether the out-of-court identification was impermissibly suggestive. *Simmons,* 390 U.S. at 384; *Maguire,* 918 F.2d at 263; *Gullick v. Perrin,* 669 F.2d 1, 6 (1st Cir.1981). If the court decides that the procedures surrounding the out-of-court identification were not overly suggestive, then the court need not continue further. *Maguire,* 918 F.2d at 263 (stating that the First Circuit has embraced the *Simmons* test and utilized it many times in answering questions concerning the admissibility of identification evidence). The court should look at the "totality of the circumstances" surrounding the initial identification to determine whether the identification was overly suggestive. *Simmons,* 390 U.S. at 383. A photo identification becomes impermissibly suggestive only if it creates a " 'very substantial likelihood of irreparable misidentification.' " *Maguire,* 918 F.2d at 264 (quoting *Simmons,* 390 U.S. at 384).

■ If the trial court determines that the out-of-court identification is overly suggestive, it may nonetheless admit the identification. The second prong of *Simmons* looks to the reliability of the challenged identification. *Simmons,* 390 U.S. at 385–386. The Supreme Court developed this prong more fully in *Manson v. Brathwaite,* holding that when the prior identification was impermissibly suggestive the question becomes " 'whether, under the totality of the circumstances, the identification' " was nonetheless reliable. *Manson v. Brathwaite,* 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (quoting *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)) (internal quotation marks omitted). The factors to consider under this reliability prong include:

> ... the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention ..., the level of certainty demonstrated at the confrontation, and the time between the crime and

the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson,* 432 U.S. at 114 (quoting *Biggers,* 409 U.S. at 199–200). Essentially, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson,* 432 U.S. at 114.

Consequently, in order to prove his claim, petitioner must show that the out-of-court identifications made by Officer Rogers and Zetzer are so impermissibly suggestive as to taint and render unreliable the subsequent in-court identifications.

▇▇▇ Petitioner cannot make out this claim. Consistent throughout the *Biggers–Simmons–Manson* line of cases is the proposition that the police caused, through the use of one procedure or another, the photo identifications to be suggestive. In *Biggers,* for example, the police orchestrated a one-on-one "show-up" between the victim and the suspect. *Biggers,* 409 U.S. at 195–196. In *Simmons,* the procedure used was a "photo array" which prominently featured the man the police suspected of having committed the crime. *Simmons,* 390 U.S. at 380. The photo identification in *Manson* was made from a single photograph of the suspect by an officer who had encountered the suspect on the night of the crime. *Manson,* 432 U.S. at 101. In the present case, however, there is no evidence whatsoever of police procedures that suggested to the witnesses in question that petitioner was the one who committed the crime.

Moreover, the SJC undertook a detailed analysis of the identifications, employing a "totality of the circumstances" test, and came to the same conclusion as the trial court: the identifications by Officer Rogers and Zetzer were not unnecessarily suggestive and also not unreliable. *Otsuki,* 581 N.E.2d at 1008–1009. The SJC found that Officer Rogers saw the wanted flyer with no prompting by the police concerning who was pictured and only then realized that it was petitioner. *Otsuki,* 581 N.E.2d at 1008. As to Zetzer, the SJC and the trial court found that the out-of-court identification was not suggestive simply because no one from the police or the Commonwealth suggested petitioner to her.

Rather, she happened upon the photo in the newspaper. *Otsuki,* 581 N.E.2d at 1009.

▇▇▇ This court likewise finds no merit in petitioner's argument that a chance interaction with a single "wanted flyer" or a single newspaper photo is so impermissibly suggestive as to create a " 'very substantial likelihood of irreparable misidentification.' " *Manson,* 432 U.S. at 116 (quoting *Simmons,* 390 U.S. at 384). The Supreme Court says unequivocally in *Manson* and *Simmons* that in each case the circumstances surrounding the challenged out-of-court identifications will be considered on their own facts. Furthermore, there is no *per se* rule of exclusion of out-of-court identifications made from a single photograph. *Manson,* 432 U.S. at 105, n. 8 (quoting *Simmons,* 390 U.S. at 384).

Although this court agrees with the conclusion of the SJC as to the non-suggestive nature of the out-of-court identifications, assuming that the out-of-court identifications were overly suggestive, petitioner's claim fails under the second prong of *Simmons* and the framework established in *Manson.* The identifications are still reliable considering the totality of the circumstances.

Both Officer Rogers and Zetzer had the opportunity to view petitioner at the time of the crime. Indeed, Officer Rogers was only inches away from petitioner. Officer Rogers was attentive when he observed petitioner. From Zetzer's testimony, it appears that she was also able to carefully observe petitioner. While the "corrupting effect of the suggestive identification" is to be weighed against these factors, this court finds that the reliability of the identifications of petitioner made by a policeman who was at the scene and an eyewitness who saw petitioner running from the scene outweigh the corrupting effect of any impermissible suggestion existent in the identifications.

Petitioner cannot show that the trial court's decision was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Consequently, for the above stated reasons, petitioner's claim that he was denied due process by the trial court's allowance of

the in-court identifications of petitioner by Zetzer and Officer Rogers fails.

## CONCLUSION

For the above reasons, this court **RECOMMENDS**[13] that petitioner's application for a writ of habeas corpus (docket entry # 5) be **DENIED.**

---

13. Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation and must identify the portion of the Report and Recommendation to which objection is made and the basis for such objection. Any party way respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986).