Kurt L. **HUENEFELD**, Petitioner,

v.

Michael **MALONEY**, Commissioner, Dept. of Correction, Respondent.

Civil Action No. 98–10445–RGS.

United States District Court, D. Massachusetts.

July 29, 1999.

---

Kurt L. Huenefeld, Bridgewater, MA, pro se.

William J. Meade, Assistant Attorney General, Criminal Bureau, Boston, MA, for defendant.

## ORDER ON MAGISTRATE JUDGE'S REPORT AND RECOMMENDA- TION

STEARNS, District Judge.

Upon review of the Magistrate Judge's thorough Report and the petitioner's Objections, I will adopt her Recommendation that the petition for writ of habeas corpus be *DENIED.* I agree with the Magistrate Judge's finding that the prosecutor's "[o]ne tells you why" statement constituted an improper comment on the petitioner's decision not to testify (Ground 8) but that in the totality of the trial the error was not of such magnitude as to cast doubt on the integrity of the verdict.

SO ORDERED.

## FINDINGS AND RECOMMENDATION ON RESPONDENT'S MOTION TO DISMISS WRIT OF HABEAS COR- PUS AND PETITIONER'S APPLI- CATION FOR WRIT OF HABEAS CORPUS

ALEXANDER, United States Magistrate Judge.

### I. Background

On September 24, 1983, petitioner, Kurt Huenefeld, ("petitioner") was convicted of second degree murder and of burglary and armed assault in a dwelling house after a six day jury trial in the Massachusetts Superior Court. He was sentenced to a term of life imprisonment on the murder charge, and ten to twelve years on the other charges. His convictions were affirmed by an order of the Massachusetts Appeals Court. *See Commonwealth v. Huenefeld,* 19 Mass.App.Ct. 1109, 475 N.E.2d 439, *fur. app. rev. den.,* 394 Mass. 1104, 478 N.E.2d 1274 (1985). Petitioner made a subsequent motion for a new trial that was denied by the trial judge on February 3, 1992. Petitioner appealed from that denial, and the denial was affirmed by the Massachusetts Appeals Court. *See Commonwealth v. Huenefeld,* 34 Mass.App.Ct. 315, 610 N.E.2d 341, *fur. app. rev. den.,* 415 Mass. 1103, 614 N.E.2d 999 (1993).

On March 21, 1995, petitioner filed his first application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This Court dismissed the application on the grounds that petitioner had failed to exhaust state remedies for all of his claims. *See Huenefeld v. Dubois,* No. 95–10673–RGS, slip op. at 3–4 (D.Mass. Mar. 1, 1996). Petitioner then filed a second motion for a new trial that was denied by the Massachusetts Su-

perior Court on April 18, 1997. The denial of petitioner's second motion for a new trial was affirmed by the Massachusetts Appeals Court on November 20, 1997. *See Commonwealth v. Huenefeld,* 44 Mass. App.Ct. 1101, 687 N.E.2d 651, *fur. app. rev. den.,* 426 Mass. 1108, 691 N.E.2d 581 (1998).

On March 3, 1998, petitioner filed this second application for a writ of habeas corpus. Respondent has moved to dismiss the petition on the grounds that it is time-barred under 28 U.S.C. § 2244(d)(1), and that the petitioner has failed to exhaust his state remedies as to claims 1, 2, 4, 7, 9, and 11. For the reasons set forth below, this Court denies petitioner's application.

## II. Facts

On the evening of October 25, 1982, petitioner and his friend John Nazzaro ("Nazzaro") set out for a night of drinking. On the way to the pub, petitioner and Nazzaro stopped at the home of Robert Crowe ("Crowe") to obtain cocaine. Petitioner injected cocaine while at Crowe's home.

On the way home, shortly after midnight, petitioner and Nazzaro again stopped by Crowe's home. This time, Nazzaro waited in the car for approximately fifteen minutes. When petitioner returned to the car, he told Nazzaro he had used more cocaine. The two then returned to petitioner's parents' home, and went to a basement room where Nazzaro went to sleep.

At 2:30 a.m., petitioner woke Nazzaro and relayed to him a frenzied confession: while Nazzaro slept, petitioner had returned to Crowe's home to steal cocaine and when Crowe awoke in the middle of the burglary, petitioner stabbed him several times with a screwdriver, fled through Crowe's bedroom window, and returned home. Nazzaro and petitioner then created an alibi to shield themselves from accusations.

Crowe's body was discovered by his father on the 26th, and Crowe's sister told police that petitioner did enter the Crowe home at about 12:30 a.m. while Nazzaro waited out in the car. She reported that some time before 2:30 a.m., she was awakened and heard her brother exclaim, "[w]hat the hell are you doing?"

When questioned together, Nazzaro and petitioner stuck to their alibi through the next day, but by the 27th of October when Nazzaro, accompanied by his father and a lawyer, met with police alone, he agreed to tell them truthfully what had commenced on the night of the 25th. Police then obtained a warrant to search petitioner's home, and seized evidence that was later used at trial. Upon examination of Crowe's body, the Commonwealth's expert pathologist offered the opinion that the injuries inflicted were consistent with those that would be caused by an attacker wielding a screwdriver.

## III. Petitioner's Application Is Not Time–Barred

On April 24, 1996, the Antiterrorism and Effective Death penalty Act of 1996, Pub.L. No. 104–132, § 104, 110 Stat. 1218 ("AEDPA"), was signed into law by president Clinton. Where a prisoner's conviction became final prior to the enactment of the AEDPA, the prisoner has one year from the effective date of the AEDPA to file his application. *See Connors v. Matesanz,* No. 98–12002–WGY, 1999 WL 98531, slip op. at 8 n. 6 (D.Mass. February 24, 1999) (accepting the reasoning of other courts that created a one year grace period for filing); *Alves v. Matesans,* 20 F.Supp.2d 135, 136 (D.Mass.1998) (applying a one year grace period and allowing petitioners until April 25, 1997 to file the petition); *Zuluaga v. United States,* 971 F.Supp. 616, 619 (D.Mass.1997) (same); *Healy v. DiPaolo,* 981 F.Supp. 705, 706–7 (D.Mass.1997); *see also Lindh v. Murphy,* 521 U.S. 320, 336–37, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997) (holding that the chapter 153 amendments to the federal

habeas statute were meant to apply only to cases filed after the AEDPA was enacted).

28 U.S.C. § 2244(d)(2) contains a tolling provision for tolling the statute of limitations for filing a petition for a writ of habeas corpus.[1] Respondent argues that the tolling provision set forth in the statute does not apply to the judge made grace period created for petitioner's whose convictions became final before the passage of the AEDPA. (Respondent's Memorandum in Support of Motion to Dismiss at 5.) Respondent urges this Court to adopt a very narrow construction of the statutory language that would limit the application of the tolling provision to the period of limitation set forth specifically under the 2244(d)(2) subsection.

Courts have wrestled with the question of whether or not the tolling provision should apply to the judge made grace period, and some have determined that it does not. *See Cole v. Kuhlmann,* 5 F.Supp.2d 212, 213–14 (S.D.N.Y.1998); *Powell v. Williams,* 981 F.Supp. 1409, 1413–14 (D.N.M.1997). The majority of courts in this district and elsewhere, however, has held that the tolling provisions do apply to the judge made grace period. *See Gendron v. United States,* 154 F.3d 672, 675 & n. 3 (7th Cir.1998) *cert. denied,* —— U.S. ——, 119 S.Ct. 1758, 143 L.Ed.2d 790 (1999); *Hoggro v. Boone,* 150 F.3d 1223, 1226 (10th Cir.1998); *Lovasz v. Vaughn,* 134 F.3d 146, 149 (3d Cir.1998); *Fields v. Johnson,* 159 F.3d 914, 916 (5th Cir.1998) (per curiam); *Connors,* 1999 WL 98531, slip op. at 10 n. 7 (J. Young); *Healy,* 981 F.Supp. at 706–7.

■ Courts have expressed concern that the language of the tolling provision which requires only that the application be "properly filed" could be interpreted in a manner that would allow a petitioner to file an unending stream of post-conviction motions with the state courts to avail themselves of the tolling mechanism and repeated extensions of the limitation period. *See Connors,* 1999 WL 98531, slip op. at 10–11. Concerns for comity, however, mitigate against the involvement of the federal court in an evaluation of the substance of a prisoner's filings for state post-conviction relief. *See id.* at 12 n. 8. This Court agrees with Judge Young that to be "properly filed" within the meaning of the statute, the petition must be submitted in compliance with the state's procedural requirements for successive collateral attacks on a conviction, e.g. timeliness and filing in the proper place. *See id.* at 13.

■ In light of the foregoing, this Court finds the reasoning of the district court in *Healy* and *Connors, supra,* to be persuasive, and finds that the tolling provisions of § 2244(d)(2) do apply to the judge made grace period, and have tolled the grace period in the case *sub judice.*[2] Petitioner's application is not, therefore, time-barred. This Court further finds that petitioner's application was properly filed.

### IV. Standard of Review

Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." It is not, therefore, necessary to

---

**1.** The statute reads, in relevant part: "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

**2.** The grace period runs from April 24, 1996 to April 25, 1997. On January 24, 1996, petitioner's first habeas petition was dismissed. On March 7, 1997, he submitted his

second motion for a new trial with the Massachusetts superior court. This filing tolled the grace period with 50 days remaining. The motion was denied on April 18, 1997, the denial affirmed on November 20, 1997, and further appellate review was denied by the SJC on January 29, 1998. At that point, the clock again began running, and 36 days passed before petitioner filed this application for habeas relief on March 3, 1998. Of the one year grace period, twelve days remain.

address the second argument Respondent raises, namely that Grounds 1, 2, 4, 7, 9, and 11 of the petitioner's application are unexhausted. *See also Gagne v. Fair,* 835 F.2d 6, 9 (1st Cir.1987); *Otsuki v. Dubois,* 994 F.Supp. 47, 56 n. 11 (D.Mass.1998) ("28 U.S.C. § 2254(b)(2) allows this court to deny an application for a writ of habeas corpus on the merits, notwithstanding the failure of the applicant to exhaust all available state remedies"). Based on the record, this Court finds that in this instance, strict adherence to the exhaustion principle would very likely result in further unnecessary litigation in the state courts. *See Otsuki,* 994 F.Supp. at 56 n. 11.

The AEDPA prohibits the federal court from granting a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2).

■ The First Circuit has interpreted this language to set forth a two step analysis for application by the reviewing federal habeas court. *See O'Brien v. Dubois,* 145 F.3d 16, 24 (1st Cir.1998); *see also Vasquez v. DiPaolo,* No. Civ. 96–12261–PBS, 1998 WL 428012, at \* 6–7 (D.Mass. July 23, 1998) (M.J.Alexander). The habeas court must first determine if the Supreme Court has issued a rule that governs the petitioner's claim. *See O'Brien* 145 F.3d at 24. If it has, the habeas court evaluates whether the state court's decision was "contrary to" the governing rule. *See id.* Ascertaining whether or not the Supreme Court has prescribed a rule that governs a petitioner's claim is not an easy question. The First Circuit has clarified the requirement, holding that "the key inquiry, at

bottom, is whether a Supreme Court rule—by virtue of its factual similarity . . . or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case." *See id* at 25.

■ If there is no Supreme Court rule on point, the habeas court moves to step two and analyzes whether the state court's use of, or failure to use, existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent. *See id.* The habeas court is not empowered under this clause of the AEDPA to issue the writ when it disagrees with the state court's decision or where it reckons that it would have reached a different result. The writ shall issue only where the state court's decision is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *Id.*

■ Petitioner has alleged numerous trial errors. At the outset, the Court notes that on collateral review of habeas cases involving trial error, the test for harmless error, if error is found at all, follows the standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946), which requires the habeas court to determine if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). The First Circuit has restated the test as requiring a consideration of "whether the error was of such magnitude that it actually casts doubt on the integrity of the verdict." *Gilday v. Callahan,* 59 F.3d 257, 269 (1st Cir.1995) *cert. denied,* 516 U.S. 1175, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996). Accordingly, the analysis of the claims at bar follows suit, keeping in mind that "the presumption that a criminal judgment is final is at its

strongest in collateral attacks on that judgement." *Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (citing *U.S. v. Frady,* 456 U.S. 152, 162–69, 102 S.Ct. 1584, 1591–95, 71 L.Ed.2d 816 (1982)).

## V. Analysis of Claims

*Ground 1 Denial of Due Process of Law By Loss of Material Evidence in the Custody of the Commonwealth*

Petitioner asseverates that the State suppressed material evidence in violation of the mandate of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it lost alleged records kept by Crowe documenting names of people who owed him money for drugs or loans that were discovered after a search of the victim's room. (Petitioner's Memorandum in Support of Writ at 4–5.) Because the alleged motive for the murder was theft of Crowe's cocaine, Petitioner argues that the list was exculpatory evidence that would have enabled him to demonstrate the existence of other suspects. Petitioner further argues that the list would have enabled him to impeach the testimony of the prosecution's witness, Nazzaro, who testified that he had only spoken to Crowe a few times, and had only been to Crowe's home once prior to the night of the murder. (Pet.Memo. at 5.)

Petitioner raised this issue in his first motion for a new trial, and on appeal of the denial of that motion, the Appeals Court, citing to the Commonwealth's appellate brief attached as an addendum to its Order, stated that "*all* of the contentions raised on [the defendant's appeal of the denial of his first motion for a new trial] are without merit, as each is controlled by settled legal principles or lacks support in the record." *Commonwealth v. Huenefeld,* 97–P–1059 Add. at 2.7–2.8 (emphasis in original) The Appeals Court reaffirmed its holding after petitioner raised the issue again in his second motion for a new trial. *See id.*

■ The Supreme Court has held that the police are only required to preserve that evidence which is material to the defendant's case. *See California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). Under *Trombetta,* material evidence is evidence which is apparently exculpatory before it is lost and must be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id* at 489, 104 S.Ct. 2528. If the evidence does meet the requirement for materiality but is only potentially useful—possibly exculpatory rather than clearly exculpatory—failure to preserve the evidence will not constitute a denial of due process unless petitioner can demonstrate bad faith on the part of the police or the prosecution. *See Arizona v. Youngblood,* 488 U.S. 51, 55, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988).

■ The Supreme Court rule is dispositive of the issue here. It is merely speculation on petitioner's part that the documents would have provided material evidence, and petitioner does not point to any singular suspect whose identity would have been revealed on the list, alleging only that the list would have "demonstrat[ed] the existence of many viable suspects." (Pet.Memo. at 5.) At best, the documents at issue here are in the category of possibly exculpatory evidence. Petitioner must therefore make a showing of bad faith on the part of the police or the prosecution. Petitioner has made no showing that the police acted in bad faith when they lost the evidence.

Further, petitioner was not deprived of the impeachment value, if any, of the list. Nazzaro's testimony regarding the frequency of his visits to the Crowe home was discredited at trial by the testimony of Crowe's sister who stated that Nazzaro visited the Crowe home on a weekly basis. (Pet.Memo. at 6.)

Accordingly, Petitioner's prayer for relief predicated on Ground One is hereby DENIED.

*Ground 2 Denial of Due Process of Law as the Result of Constitutionally Deficient Jury Instruction*

Petitioner next objects to an analogy given by the trial judge while explaining to the jury the permissibility of drawing certain inferences from the evidence.[3] Petitioner argues that the analogy improperly led the jury to conclude that its verdict could be based on speculation, not proof beyond a reasonable doubt. Petitioner also attacks the trial judge's formulation of proof beyond a reasonable doubt, which included the phrase "not proof beyond all reasonable doubt, all imaginary doubt." (Pet.Memo. at 8.)

The Supreme Court has held that the due process clause protects an accused in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). Review of a claimed deficient jury instruction requires that the instruction be viewed in the context of the overall charge. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In determining whether the instruction has caused a constitutional violation, a reviewing court seeks to determine how a reasonable juror could have interpreted the instruction. *See Sandstrom v. Montana,* 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979).

Supreme Court precedent cannot be said to be wholly dispositive of the issue here. This Court therefore moves to the second step of the *O'Brien* analysis to determine if the state court's action was "objectively reasonable." *O'Brien,* 145 F.3d at 25.

In affirming the superior court's denial of the petitioner's second motion for a new trial, the Massachusetts Appeals Court held that the analogy given in the instruction explaining permissible inferences was not erroneous, or at a minimum did not result in any prejudice to the defendant. *See Commonwealth v. Huenefeld,* 9–P–1059, at Add. 2.9 (Mass.App.Ct.1997).

This Court agrees, and finds no error in the permissible inference instruction. Taken as a whole, the entire analogy portrays a process of drawing reasonable inferences from evidence—a reasonable juror would understand that it would not be permissible to invent wild, speculative inferences devoid of any factual basis. This is particularly so given the judge's concluding caution that inferences must be based upon the facts credited as true by the jurors.

The Appeals Court also found that the reasonable doubt instruction was proper,[4]

---

**3.** The instruction in question read: "Suppose you are driving out the Concord Turnpike out to Arlington or Lexington early in the morning, and you see a guardrail has been completely broken through, and under the guardrail you see some tracks. They look like fresh tracks. It's reasonable to infer that an automobile went through the guardrail. You may infer that he went through recently. If there are tire marks on the street just before it, you may infer that it was an automobile from their width and not a truck. You may, you may not. If there were no tire marks, you may infer that he fell asleep, didn't hit his brakes before he went over. You may not infer that too. It's entirely up to you. You may say he tried to avoid something, or he just went over. You can get into inferences—become very

speculative, you can come to inferences that are very populous [sic], but the inferences you make must be based upon the facts that you determine to be the truth in this trial." (Pet. Memo. at 7.)

**4.** The contested language was taken from *Commonwealth v. Little,* 384 Mass. 262, 266 n. 4, 424 N.E.2d 504 (1981). Two years after petitioner's trial, the phrase was disproved in *Commonwealth v. A. Juvenile (No. 2),* 396 Mass. 215, 217–20, 485 N.E.2d 170 (1985), and the Massachusetts Appeals Court has since advised that this portion of the *Little* charge "may constitute error and ought to be avoided." *Commonwealth v. Bowie,* 25 Mass. App.Ct. 70, 80, 514 N.E.2d 1345 (1987), *fur.*

and the contested language "an isolated phrase couched within four pages of an otherwise proper instruction that adequately and repeatedly emphasized the Commonwealth's burden to prove each and every element of the offense beyond a reasonable doubt." *Id.* at Add. 2.11–12. Tracking the requirements of Supreme Court precedent, the Court held that the judge's misstatement could not be said to warrant reversal where it was made in the context of an instruction that, on the whole, correctly stated the State's burden. *See id.* at 2.11.

■■■■ Again, the language must be considered in the context of the entire instruction. The phrase, while perhaps inartful, cannot be said to have had a substantial or injurious effect on the jury when the rest of the instruction provided the jury with a correct statement of the State's burden. A reasonable juror would not have concluded that the quantum of proof required to convict was anything less than proof beyond a reasonable doubt. The impact of the misstatement here is not of such "magnitude that it actually casts doubt on the integrity of the verdict." *Callahan,* 59 F.3d at 269.

For these reasons, petitioner's prayer for relief predicated on Ground Two is hereby DENIED.

*Ground 3 Denial of Fair Trial and Due Process of Law Through Commonwealth's Intentional Failure to Investigate Evidence That Was Either Exculpatory or Would Damage the State's Case against the Petitioner*

A sample of the victim's head hair and fibers taken from the victim's left hand were examined by the Massachusetts Department of Public Safety. (Lab Report attached to Pet.Memo. at Add. 55.) The fibers taken from the victim's hand consisted of blue, green, and red fibers, and one light brown human head hair. (Report at Add. 56.) The State concluded that the "fibers from the victim's left hand

... is dissimilar to the hairs removed from ... the victim's head hair." (Report at Add. 58.) Petitioner argues that the State had an obligation to conduct a comparative test of his hair with the hair found in Crowe's hand. Petitioner argues that the Prosecutor further erred when he solicited misleading testimony from one of the Commonwealth's experts who testified that the victim's head hair was light brown in color, and that human head hair found in the victim's hand was light brown in color, thus leaving the jury to conclude that the hair in the victim's hand was the victim's own. Petitioner concludes that because there was an absence of any physical evidence directly connecting any individual to the crimes, this testimony created a "false" impression in the minds of the jurors and denied him the right to a fair trial, because had the jurors known the single brown hair in the left hand of the victim was neither the victim's, nor petitioner's, a reasonable doubt as to petitioner's role in the crime would have been raised.

■■■■ As to petitioner's first line of attack, the Supreme Court has held that the prosecutor's duty to search for material evidence that is favorable to the defendant extends beyond the prosecutor's office to other government offices working on the investigation. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995). It is beyond cavil, however, that the prosecutor in a criminal case is under no obligation to conduct an investigation for the defense. *See, e.g., United States v. Hawkins,* 78 F.3d 348, 351 (8th Cir.1996) ("the government has no affirmative obligation to discover potentially exculpatory information which it neither possessed nor of which it was aware"). The State had no duty to examine petitioner's head hair.

As to his second argument, the Supreme Court has held that to constitute a due process violation, prosecutorial misconduct must be of sufficient significance to result

*app. rev. den.,* 401 Mass. 1103, 519 N.E.2d 595 (1988).

in the denial of the defendant's right to a fair trial. *See United States v. Bagley*, 473 U.S. 667, 675–76, 105 S.Ct. 3375, 3379–80, 87 L.Ed.2d 481 (1985). Supreme Court precedent is not dispositive of the issue here, and so this Court directs its inquiry to whether the state court's action was reasonable.

■ Assuming without deciding that the testimony elicited by the prosecutor did lead the jury to believe that the hair in the victim's hand was the victim's own, the question becomes, did this testimony have a substantial and injurious effect or influence on the jury's verdict. In other words, the issue is not whether the prosecutor acted improperly, but whether the prosecutor's actions warrant reversal. *See e.g., United States v. Mateos–Sanchez*, 864 F.2d 232, 240 (1st Cir.1988).

As the Appeals Court observed, there was no evidence which connected the fibers taken from the victim's left hand to the clothing or mattress seized during the search of petitioner's home. *See Huenefeld*, 34 Mass.App.Ct. at 320, 610 N.E.2d at 345. The fiber samples were not, therefore, in any way inculpatory. The only evidence before the jury was that the human head hair did not belong to Crowe.

Petitioner submits that but for the testimony concerning the source of the head hair in Crowe's left hand, the jury would not have convicted him. In light of the other evidence presented, notably the testimony of Nazzaro which was corroborated in part by certain physical and testimonial evidence, it cannot be said that the jury's erroneous belief that the hair in the victim's hand belonged to the victim was of such magnitude that it "actually casts doubt on the integrity of the verdict." *Sinnott v. Duval*, 139 F.3d 12, 15 (1st Cir.1998) (quoting *Gilday v. Callahan*, 59 F.3d 257, 269 (1st Cir.1995)). If in fact this is the conclusion the jury drew based on the testimony elicited by the prosecutor, no harm was done to petitioner as a result.

In Ground Three, petitioner also raises the argument that the prosecution erred when it failed to pursue further testing of swatches of fabric taken from his mattress beyond the initial tests that revealed that bloodstains on the mattress fabric were of the same blood type as Crowe's, Group A. Petitioner avers that the prosecutor intentionally avoided further testing because he believed it would damage his case or aid the case of petitioner.

■ Again, the relevant question here is not whether the prosecution acted improperly, but whether his actions warrant reversal, and again, the answer is no. Petitioner has mounted numerous collateral attacks on the presentation of testimony regarding the blood type of the stains found on his mattress. Of critical importance is the fact that at the conclusion of the evidence, an affidavit, in the form of an agreed stipulation, of petitioner's expert, Dr. John Abbott, who had been commissioned by the defense during the trial to conduct an independent serological analysis of the blood, was submitted into evidence. *See Huenefeld*, 34 Mass.App.Ct. at 319, 610 N.E.2d at 345.[5] The affidavit

---

5. In analyzing an earlier claim by petitioner that he was denied effective assistance of counsel because his attorney failed to have the mattress blood tested independently, the Court wrote: "[a]nalysis of blood stains found on [petitioner's] mattress cover showed a common blood group (type A) with that of the victim. It was admitted as evidence at trial. But during crossexamination of the Commonwealth's forensic witness, a chemist attached to the State police laboratory, defense counsel elicited testimony to the effect that, with more sophisticated equipment, a chemist could perform a more finite blood grouping analysis which might exclude the defendant altogether. Defense counsel pressed the trial judge for funds to hire an independent serologist to test the stains on the mattress cover. The judge permitted this to be accomplished. At the conclusion of the evidence, the defense presented (in the form of an agreed stipulation) an affidavit of Dr. John Abbott, which stated that the blood stains tested from the mattress cover sample could not possibly match the blood of the victim.... That trial counsel chose not to risk possible inculpatory

stated that the blood stains tested on the mattress cover fabric could not possibly match the blood of Crowe. *See id.*

Petitioner makes no showing that the prosecution here intentionally sought to avoid further investigation. Moreover, this Court agrees with the Appeals Court that any harm that may have been wrought by the fabric evidence and the testimony presented by the State's witnesses suggesting that the blood samples matched was effectively neutralized by the submission of the parties' agreed stipulation that the bloodstains on the fabric could not possibly match the blood of the victim. This Court can discern no error on the part of the prosecutor with regard to the presentation of evidence concerning the bloodstained mattress fabric, and so finds petitioner's claim to lack merit.

Petitioner's claims for relief predicated on Ground Three are hereby DENIED.

*Ground 4 Denial of Fundamental Constitutional Right to Present a Witness*

Petitioner next challenges the trial court's decision to require the parties to submit Dr. Abbott's testimony in the form of an agreed joint stipulation and claims the decision deprived him of the right to present witnesses in his defense.

 A defendant's right to present relevant evidence is not unlimited. *See United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998). The exclusion of evidence is unconstitutionally arbitrary or disproportionate where it has infringed upon a weighty interest of the accused. *See id.* The trial judge's discretionary decision to request submission of Dr. Abbott's testimony in the form of an agreed stipulation does not contravene the Supreme Court's prescribed rule.

This is not a case where the defendant was deprived of the opportunity to present his own testimony in his defense, *cf. Rock v. Arkansas,* 483 U.S. 44, 56–57, 107 S.Ct. 2704, 2711–2712, 97 L.Ed.2d 37 (1987), or the critical testimony of an eye witness, *cf. Washington v. Texas,* 388 U.S. 14, 16–17, 87 S.Ct. 1920, 1922, 18 L.Ed.2d 1019 (1967). In fact, respondent was not deprived of the opportunity to present any evidence. The trial court merely required the evidence to be submitted in a certain form. Moreover, the parties' joint agreed stipulation—representing their agreement on a particular point—if anything, likely benefitted petitioner as it contained the prosecution's concession that the blood from petitioner's mattress could not possibly have matched Crowe's blood.

For the foregoing reasons, petitioner's claim for relief predicated on Ground Four is also DENIED.

*Ground 5 Denial of Fair Trial and Due Process of Law Where Convictions were Obtained with Improperly Admitted Physical Evidence and Improperly Obtained Evidence*

Petitioner alleges that the trial judge erred when she admitted into evidence clothing, including a pair of light gray corduroys, and boots belonging to petitioner stained with occult (visible only with the aid of a microscope) blood, after being assured by the prosecution that it would provide testimony that petitioner had been seen wearing the clothing, or clothing similar to it, (Pet.Memo. at 14), on the night of the murder. Petitioner argues that the judge erred again when she refused to strike the clothing after the prosecution failed to provide such testimony and failed to give an instruction to the jury on the purpose of admitting the pants. He also alleges that error occurred when the trial

---

results until after the Commonwealth's evidence was presented to the jury appears to have been a reasonable tactical decision ...." *Huenefeld,* 34 Mass.App.Ct. at 319, 610 N.E.2d at 344–45. Apparently, the trial judge at one point admonished the parties for fail-

ing to test the blood sooner. (Pet.Memo. at 12–13, n. 5 & 6.) The trial judge denied the prosecution's request for a mistrial, and Abbott's testimony was submitted in the form of an agreed stipulation.

judge admitted evidence of occult traces of blood found in Nazzaro's car when the state failed to properly secure the chain of custody of the car.

First, except in cases involving a violation of a specific constitutional provision, the Supreme Court has stated that a federal court "may not reverse a state 'trial judge's action in the admission of evidence' unless the evidentiary ruling 'so infuse[s] the trial with unfairness as to deny due process of law.'" *Riggins v. Nevada*, 504 U.S. 127, 147, 112 S.Ct. 1810, 1821, 118 L.Ed.2d 479 (1992) (Thomas J., dissenting) (quoting *Lisenba v. California*, 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941)).

Petitioner argues that the court's evidentiary rulings saturated the trial with unfair prejudice to him, consequently resulting in the denial of his due process right. Judicial rulings, made in the heat of trial, that turn on the often close question of whether the probative value of certain evidence outweighs the likelihood of undue prejudice to the defendant if it is admitted, emerge from a fact sensitive analysis that does not easily lend itself to review under the first step of *O'Brien*. The Court will therefore focus its inquiry on whether or not the state court's decision reflects an unreasonable application of clearly established Supreme Court jurisprudence.

Petitioner was accused of a particularly violent and bloody murder. The corduroys he was wearing at the time of his arrest, (Pet.Memo. at 14), had reddish brown stains on the right pant leg which tested positive for small but untraceable amounts of blood. (Report at Add. 57.) Tests conducted on petitioner's brown shoes also revealed traces of occult blood. (*Id.*) The admission of most "real" or physical evidence requires an offer or promise of evidence sufficient to permit the jury to find that the evidence is what its proponent claims it to be. The prosecution made such an offer of evidence to the judge, and she allowed the clothing to come into evidence.

The prosecution offered testimony that neither ruled out nor confirmed the conclusion that petitioner wore the corduroys on the night of the murder. The jury heard testimony from three witnesses regarding the clothing. Nazzaro testified that he did not remember what petitioner had been wearing before or after confessing to the murder. (Pet.Memo. at 15.) Janet Crowe, the victim's sister, offered the same testimony as Nazzaro. (*Id.*) Donna Crowe, the victim's other sister, testified that petitioner had been wearing blue jeans and possibly a checkered shirt on the night of the murder. (*Id.*) Dr. Abbott stipulated that the blood sample on the pants was insufficient to conduct a matching test with the victim's blood. *See Huenefeld*, 34 Mass.App.Ct. at 323, 610 N.E.2d at 347.

The judge's decision to let the pants in was based on an offer of proof by the prosecution that witnesses would testify that the clothes, or similar clothes were worn by petitioner on the night in question. Although two of the witnesses could not remember what Huenefeld was wearing, Donna Crowe did recall that Huenefeld was wearing blue jeans, pants that are not dissimilar from light gray corduroys.

Without testimony affirmatively placing petitioner in the clothes on the night of the murder, the relevance and probative value of the evidence is reduced, however, it cannot be said that the evidence had no relevance or probative value, nor can it be said that the evidence, in light of the testimony given and the Abbott stipulation was overly prejudicial. It is axiomatic that all evidence is prejudicial— the relevant question is whether or not the evidence in question was overly prejudicial, so much so that its likely prejudicial effect outweighed its probative worth. The trial judge exercises broad discretion in making this decision, and this Court does not find her ruling to be an unreasonable application of Supreme Court precedent. This Court agrees with the Court of

Appeals who, rejecting petitioner's claim of prosecutorial misconduct on the basis of introducing the pants into evidence, found that "none of the witnesses called at trial, including Nazzaro, was able to state with certainty that these trousers were worn by the defendant on the night in question. There was no showing of bad faith in the prosecutor's offering the pants, and, even if the judge's ruling was erroneous, no harm was shown as a consequence." *Huenefeld*, 34 Mass.App.Ct. at 323, 610 N.E.2d at 347.

On October 27, the day following the incident, Nazzaro lent his car to his cousin because Nazzaro was scheduled to go into the Army that day. It was later that same day, however, that Nazzaro gave his statement to the police and told them that petitioner had awoken him in the middle of the night, and confessed to taking Nazzaro's car, driving to Crowe's home, killing Crowe, returning home, and washing the car out to remove any traces of blood. Following that statement, the prosecutor instructed Nazzaro to get the vehicle and bring it to Cambridge the next day.

James Canney, a chemist with the Commonwealth's Department of Public Safety examined Nazzaro's car on October 28, 1982, at the Middlesex County Courthouse Garage. Chemical tests for blood were positive on the inside door handle on the driver's side, the signal switch, the emergency brake handle, the driver's seat, the steering wheel, the headlight pull switch, and a black leather key ring holder that was removed from a set of keys belonging to the vehicle. (Report at Add. 54.) Attempts to determine the type of the blood were unsuccessful. (Report at Add. 56.)

Petitioner challenges the admission of the evidence regarding blood in the car on the grounds that it is incompetent because the proper chain of custody was disregarded when the prosecutor allowed the car to be recovered without a police presence. He also argues that the prosecutor, by eliciting testimony from Nazzaro that he, the prosecutor, had instructed Nazzaro to

bring the car to Cambridge, improperly vouched for the "integrity of Nazzaro," and "present[ed] his office as guarantor of the propriety of the decision." (Pet.Memo. at 18.)

■ Petitioner overlooks the fact that a possible defect in the chain of custody for a certain piece of evidence factors into the weight assigned to the evidence by the jury, rather than its admissibility. *See United States v. Rodriguez*, 162 F.3d 135, 144 (1st Cir.1998). Here, the jury was fully aware of where the car had been and who had possession of it between the night of the incident and the time it was forensically examined. The jury was free to assign whatever weight it thought appropriate to the Department of Safety's analysis. Additionally, petitioner has failed to demonstrate that the car was in any way tampered with or altered. The testimony elicited from Nazzaro by the prosecutor was presented to illustrate where the car had been, and this Court can find nothing improper in the prosecutor's actions.

Accordingly, petitioner's prayer for relief predicated on Ground Five is hereby DENIED.

*Ground 6 Denial of Fair Trial and Due Process of Law Where Conviction was Obtained with False Evidence*

Petitioner next contests the introduction of testimony and physical evidence which he asserts was known to the prosecution to be "false and highly misleading." (Pet. Memo. at 19.) Though not clearly articulated, the arguments imply a challenge to both the conduct of the prosecutor and the judge's decision to admit certain evidence. Both a portion of the testimony of the Commonwealth's Medical Examiner, and the claimed origin of a syringe found at petitioner's home are at issue. As stated previously, the Supreme Court has held that to constitute a due process violation, prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. *See*

*U.S. v. Bagley,* 473 U.S. 667 at 675–76, 105 S.Ct. 3375.

Dr. George Katakas, a forensic pathologist, performed the autopsy on Crowe. His report states that Crowe's blood (heart) tested negative for alcohol and barbiturate, was of Type A, that the subdural blood test was negative for alcohol, that Crowe's urine was negative for alcohol, organic bases and organic neutrals, that his bile was negative for morphine, and that a nasal swab tested negative for cocaine. (Autopsy Report at Add. 63.) The autopsy does not reflect that the presence of tract marks from intravenous drug use was observed. (Autopsy Report at Add. 60–61.) While testifying, Dr. Katakas stated that the tests performed on Crowe achieved negative results for all toxic substances. More specifically, he stated that there was no cocaine in the nasal swab, or in the blood. (Pet.Memo. at 19 n. 14.)

▮ In petitioner's statement to the police, he claimed that Crowe had used cocaine with him on the night of the murder. Petitioner argues that Dr. Katakas's testimony that there was no cocaine in the blood when no blood test had been done for cocaine was testimony that the prosecution knew to be false, and did nothing to correct. According to petitioner, the effect of the testimony harmed his credibility in a case that turned on the question of whether the jury found Nazzaro or petitioner to be more credible, thus depriving him of his right to due process.

Assuming *arguendo* that Dr. Katakas misspoke on the stand with regard to the remark concerning absence of cocaine in Crowe's blood, his testimony otherwise accurately tracked the autopsy report. The nasal swab was negative for cocaine, the report states all tests were negative for toxic substances, and there is no indication of intravenous drug use noted in the report. The jury had the autopsy report, (Pet.Memo. at 20 n. 15), heard the testimony of Dr. Katakas, and made a determination as to his credibility. That petitioner's credibility may have been impeached is

nothing more than a product of the trial function. This Court finds no misconduct on behalf of the prosecutor.

Petitioner also asserts that the prosecutor misrepresented evidence in court and solicited perjury from a witness for the State when the origin of one of the two syringes found upon a lawful search of petitioner's residence was identified incorrectly. Only one of the syringes recovered contained a needle, and this was found in a trash barrel outside of petitioner's home. A washing of this syringe revealed a cocaine residue. (Add. at 67.) The other syringe had no needle or cocaine residue, and was found on petitioner's night stand. After a discussion at side bar, the trial judge admitted the syringe with the needle, stating to the prosecution, "[i]f you represent that Mr. Nazzaro will say that he carried around a syringe with him, then I'll admit it." (Add. at 81.) The needle and syringe were identified as having been found on the petitioner's night stand.

Based on this Court's reading of the colloquy that ensued prior to the admission of the syringe, it is clear that the trial judge rejected the prosecutor's argument that the evidence should be admitted because it would demonstrate that there were traces of cocaine, the subject of the larceny, on the needle when the prosecution could not show that the cocaine on the needle was the same cocaine that was stolen from Crowe at the time of the murder. Rather, the evidence was allowed in because the judge found it was relevant as would tend to corroborate Nazzaro's testimony that he had seen petitioner inject himself with cocaine on the night of the murder.

▮ The Appeals Court correctly stated the origin of the syringe in its 1993 opinion, and found that "[w]hile its relevancy was questionable, at least some of the testimony about it was admissible over objection, because Nazzaro testified to observing the defendant inject himself with cocaine during the hours preceding the

murder." *Huenefeld,* 34 Mass.App. at 320, 610 N.E.2d at 345. This Court agrees. Petitioner's characterization of the evidence presented as "false" lacks merit. Whether the cocaine tainted needle was found in petitioner's trash, or on petitioner's bed stand, it still tended to corroborate Nazzaro's story, and therefore retained relevance and probative value. Nor was the evidence overly prejudicial to petitioner. Notwithstanding the mix up at trial regarding the exact location of each of the syringes seized during the search, no harm was done to petitioner, and this Court finds no misconduct in the acts of the prosecutor.

Accordingly, petitioner's prayer for relief predicated on Ground Six is DENIED.

*Ground 7 Denial of Fair Trial and Due Process of Law by Judicial and Prosecutorial Criticism of Petitioner's Counsel's Character*

Petitioner next takes the judge to task for admonishing his counsel in open court upon cross examination to "not play games." (Pet.Memo. at 23 n. 17.) This comment, combined with the allegedly improper comments of the prosecutor resulted, according to petitioner, in a denial of his due process rights.

The Supreme Court has stated that "the influence of the trial judge on the jury is necessarily and properly of great weight, and ... his lightest word or intimation is received with deference, and may prove controlling." *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894). Comments on a defendant's guilt certainly raise a red flag, and are "most likely ... to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence." *Quercia v. United States,* 289 U.S. 466, 472, 53 S.Ct. 698, 700, 77 L.Ed. 1321 (1933). The trial judge is "the governor of the trial for the purpose of insuring its proper conduct...." *Id.* at 469, 53 S.Ct. 698. This Court has previously found that *Quercia* provides an appropriate litmus test for objectively reasonable judicial behavior in the habeas context. *See Vasquez,* 1998 WL 428012 at *10.

It cannot be said that the judge's comments to defense counsel in this instance were unreasonable. This is particularly so given the fact that she took care to give both a general instruction to the jury that "the Court's comments to counsel ... [were] not to be taken as any indication of the Court's opinion of this case," and a specific instruction that "I might add that late Friday afternoon, think it was about four o'clock, the Court made a remark that probably was better left unsaid. These things happen. I'm not going to repeat the remark. You may remember it. In any event, I would ask you to disregard it. Any remarks such as that are no different from the attorney's remarks: they are not evidence, and I'd ask you not to consider it." *Huenefeld,* 97–P–1059, at Add. 2.18–2.19. The trial judge is charged with the responsibility to manage and supervise the trial proceedings, and that is what the judge here was doing. Any potential harm emanating from her choice of words was obviated by the judges thoroughgoing instructions. The trial judge's actions, and the Appeals Court's affirmance of those actions is reasonable in light of Supreme Court precedent.

Petitioner's prayer for relief predicated on Ground Seven is hereby DENIED.

*Ground 8 Deprivation of Due Process of Law by Prosecutorial Comments on Petitioner's Exercise of the 5th Amendment & Ground 9 Violation of Right to A Fair Trial and Due Process of Law by Numerous Prosecutorial Arguments*

Grounds 8 and 9 will be analyzed together here as they both raise the argument that petitioner was denied due process of law and his right to a fair and impartial jury as the result of numerous allegedly improper comments by the prosecutor. Petitioner avers that the prosecutor improperly (1) commented on his exercise of his 5th Amendment right to not self incriminate; (2) commented that defense

counsel was "much trickier" than the State's witness; (3) misrepresented statements of defense counsel; (4) stated that the condition of the safe in Crowe's room after the murder was observed by the locksmith, who never testified at trial; (5) argued hearsay when he stated that Nazzaro's father and lawyer told him to tell the truth when neither testified at trial; (6) vouched for the credibility of Nazzaro when he said Nazzaro did tell the truth; (7) told the jury that experienced officers knew right away that Nazzaro had not committed the crime; and (8) stated that petitioner had lied about his whereabouts on the night of the murder and misrepresented evidence regarding this issue.

■■■■ As we have seen, prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial in order to constitute a due process violation. *See U.S. v. Bagley*, 473 U.S. at 675–76, 105 S.Ct. 3375. A habeas court reviewing prosecutorial conduct has the limited role of determining whether the statements at issue "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). In other words, *Donnelly* instructs the habeas court to evaluate whether the prosecutor's comments were sufficiently prejudicial to violate the petitioner's due process right. *See id.* at 639, 94 S.Ct. 1868. To make this determination, the habeas court must evaluate the comments within the context of the trial as a whole. *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Inflammatory remarks by the prosecutor are not necessarily sufficient to establish a due process violation. *See Darden v. Wainwright*, 477

U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (finding no due process violation where the prosecutor's arguments contained highly inflammatory remarks, e.g., "[defendant] shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash" but did not "manipulate or misstate the evidence or implicate other specific rights of the accused ... such as the right to remain silent.").

■■■ Prosecutorial comment on a defendant's failure to testify in a trial is not per se error requiring automatic reversal. *See Chapman v. California* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) ("there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal of the conviction").[6]

Because the Supreme Court's treatment of the issue is not dispositive here, this Court must ascertain whether the state court's actions were reasonable in light of this precedent. In conducting the analysis, this Court looks to the weight of the evidence against petitioner, and to the presence of jury instructions cautioning the jury to make its decision on the basis of the facts alone and that the arguments of counsel are not evidence. *See Wainwright*, 477 U.S. at 179–81, 106 S.Ct. 2464.

### A. Ground 8 Alleged Comments on Defendant's Exercise of Fifth Amendment Right

The prosecutor stated during her closing argument that "[i]t's one of two people. It's either that man sitting up there [petitioner], or it's John Nazzaro on the witness

---

**6.** The Court recognizes that the harmless error standard from *Chapman*, harmless beyond a reasonable doubt, is no longer applied on collateral review of habeas cases. *See* Part IV, *supra*. The holding of *Chapman*, however, which rejects finding per se error requiring automatic reversal when a prosecutor

comments upon a defendant's failure to testify, remains applicable here. Comment on a defendant's failure to testify must be shown to have had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239.

stand" and "[w]e know they are both lying. One tells you why, and all the independent evidence backs him up." *See Huenefeld,* 197–P–1059 at Add. 2.19 n. 15. . The Appeals Court found, addressing the first statement, that "[the statement] is of no consequence. That remark did not amount to an improper comment on the defendant's exercise of his Fifth Amendment rights." *Huenefeld,* 34 Mass.App.Ct. at 320, 610 N.E.2d at 345. As to the second statement, it also found no violation of his Fifth Amendment rights. *See Huenefeld,* 197–P–1059 at Add. 2.19–2.20.

■ With regard to the first statement, although the Court acknowledges it is a close question, this Court does not find that the comment can be construed to be a reference to the petitioner's decision to not testify. The reference to John Nazzaro on the witness stand would not necessarily direct the jury's attention to petitioner's failure to testify. It tends to direct the jury's attention to Nazzaro's testimony. This Court agrees with the Appeals Court that the comment was not an improper reference to petitioner's exercise of his Fifth Amendment right.

■ Analysis of the second statement, however, compels a different conclusion. The second statement treads the same fine line as the first, using language that emphasizes Nazzaro's testimony. The statement "[o]ne tells you why," crosses the line and does tend to draw the jury's attention explicitly to the fact that petitioner did not "tell" his version. For this reason, this Court finds that the statement was an improper prosecutorial comment on the defendant's decision to not testify.

■ The Court does not find, however, that the comment was sufficiently prejudicial to violate the petitioner's due process rights. The State's case against petitioner was very strong. There was overwhelming circumstantial evidence that petitioner committed the crime. Moreover, the trial judge gave general instructions to the jury to draw no unfavorable inference, or any inference from the petitioner's refusal to testify. (Pet.Memo. at 26.) She also instructed that the attorney's remarks are not evidence. *See Huenefeld,* 97–P–1059 at Add. 2.19. All of these factors compel this Court's conclusion that absent the offending remark, the jury would still have convicted the petitioner.

Accordingly, petitioner's prayer for relief predicated on Ground Eight is hereby DENIED.

*B. Ground 9 Other Improper Prosecutorial Comments*

Upon examination of petitioner's claims of prosecutorial misconduct, the Appeals Court found that "no harm befell [petitioner], [ ] he 'furnish[ed] no analysis which might [have been] helpful in the assessment of his complaints' or there was 'no basis in the record' for [petitioner's] assertions." *Huenefeld,* 97–P–1059 at Add. 2.21 (quoting *Commonwealth v. Huenefeld,* 34 Mass.App.Ct. at 322–23, 610 N.E.2d 341). This Court will examine each of petitioner's assertions in turn.

*(1) Comment that defense counsel was "much trickier" than the State's witness*

■ The comment in full stated, "[i]t told you, I would suggest, that [defense counsel] is much smarter than Mr. Nazzaro, much smarter, much trickier. He can take five transcripts, ask [a] specific question that happened to him a year ago, he can trip him up." (Pet.Memo. at 24 n. 20.) This Court finds no impropriety in counsel's argument. The statement merely sought to argue the credibility of the State's witness, Nazzaro, and even if the statement were improper, in light of the State's case against petitioner it cannot be said to have had a substantial or injurious affect on the jury's verdict.

*(2) Misrepresented statements of defense counsel & (3) stated that the condition of the safe in Crowe's room after the murder was observed by the locksmith, who never testified at trial*

Petitioner takes issue with the comment, "[n]ow at the time that the photograph, the

photograph that Mr. Egbert repeatedly tells you is contrived, staged, members of the state police, members of the Bedford Police, they are lying. This photograph was taken early afternoon after the locksmith came, and he was there, independent witness ..." (Pet.Memo. at 27 n. 23.) As to petitioner's argument regarding the first sentence, this Court finds nothing improper in the prosecutor's statement. Counsel need not use the same words to express the ideas proffered by opposing counsel. The first sentence merely argues what it would mean, logically, if the photograph was not authentic, namely, that such a conclusion would compel the coterminous conclusion that several people had cooperated to perpetrate the fraud.

 The second sentence is an improper comment inasmuch as it could be construed as asserting or implying the knowledge of a witness who has not testified. For the reasons stated previously, however, this Court finds no due process violation.

*(4) Hearsay argued when prosecutor stated that Nazzaro's father and lawyer told Nazzaro to tell the truth when neither testified at trial; & (5) Prosecutor vouched for the credibility of Nazzaro when he said Nazzaro did tell the truth*

 The prosecutor stated, "John Nazzaro looked nervous. They decided to re-interview him. Talked to a lawyer, talked to his father. They told him to tell the truth. He did." (Pet.Memo at 28 n. 24.) The prosecutor was prohibited from asking Nazzaro exactly what his father and lawyer told him when defense counsel objected to the line of questioning and the judge sustained the objection. This Court finds nothing improper in the prosecutor's comments, however, as counsel may draw reasonable inferences from the evidence, and argue the credibility of the state's witnesses. Moreover, the trial judge instructed the jury that arguments of counsel were not evidence and should not form

the basis for their determination of the petitioner's guilt or innocence. Even if the statement were improper, in light of the State's case against petitioner it cannot be said to have had a substantial or injurious affect on the jury's verdict.

*(6) Comment that experienced officers knew right away that Nazzaro had not committed the crime*

Again, counsel may draw reasonable inferences from the evidence. This Court finds nothing improper in this statement.

*(7) Comment that petitioner had lied about his whereabouts on the night of the murder and misrepresented evidence regarding this issue*

The prosecutor said,

"This is the man whose [sic] concerned-that period of time. This is the man who lies to the police about that.... The times are fixed independent, either party, critical time. Time of the murder, the time [petitioner] alibis himself, says he is with John Nazzaro, says he is at home, says he's having a beer, that's the time Robert Crowe is being killed. Now, if you believe Kurt Huenefeld's statement, that means that he knows or knew he was with John Nazzaro. That's impossible.... He's putting through the substance of these statements, himself and John together at his house at one o'clock drinking a beer. He focuses in on that time. Why? Because he knows the time he has to not be at Robert Crowe's house." (Pet.Memo. at 30 n. 25, 26, 27.)

Petitioner argued that the prosecutor misrepresented the evidence when she argued to the jury that he had lied about his whereabouts on the night of the murder. The prosecutor's statements here are calculated to portray the events based on the State's reasonable interpretation of the evidence. Petitioner argues that his statement to the police was consistent with the rest of the testimonial evidence given by the State's witnesses which would place

petitioner at his home at 1:00 a.m. on the night of the murder, and that he, therefore, did not lie. The Court notes at the outset that petitioner's statement to the police is inconsistent on this point. At first, he told police he arrived home at "around 1:00 a.m." (Pet.Memo. at Add. 17.) Later in the interview he told police he arrived home at "about 12:30 a.m." (Pet. Memo. at Add. 19.)

The Commonwealth argued that the murder took place between 1:00 and 1:30 a.m. Crowe's sisters testified that petitioner came by sometime after midnight and left just after 12:30 a.m., after which Crowe and his sisters went to bed. Janet Crowe estimated she laid awake for a period between one half hour and one hour when she heard Crowe say, "[w]hat the hell are you doing?" and heard other noises. Nazzaro estimated that he and petitioner arrived at petitioner's home shortly after they left Crowe's home. Nazzaro testified that he and petitioner spent a small amount of time in the car upon their arrival, and then went in to watch T.V. for about twenty minutes before going to bed.

Nazzaro also testified that petitioner woke him up at around 2:30 a.m., confessed to the murder, and explained that he had already washed his clothes and cleaned out the car. Nazzaro stated that petitioner told him he was concerned that he may have been observed leaving to return to Crowe's home, as he inadvertently set off the car alarm in Nazzaro's vehicle when he left to return to Crowe's. Alan MacIntosh, petitioner's neighbor, did report seeing petitioner and Nazzaro arrive home sometime between 12:30 a.m. and 1:00 a.m., and that he heard the car alarm in Nazzaro's car go off fifteen to 30 minutes later.

■ The State accused petitioner of the murder, and petitioner's defense was to argue that Nazzaro had committed the murder and attempted to shift the blame to him. In light of their respective theories of the case, the prosecutor's argument merely points out the obvious: the two

men could not have been together at the time of the murder, as one of them committed the murder. It was entirely appropriate for the prosecutor to argue this point. Further, this Court finds petitioner's argument that his statement to the police "precisely corresponds with that of the Commonwealth's witnesses, and specifically, Nazzaro's," to lack merit as it is without basis on the record.

Petitioner's prayer for relief predicated on Ground Nine is hereby DENIED.

*Ground 10 Denial of Effective Assistance of Counsel & Ground 12 Denial of Effective Assistance of Counsel on Direct Appeal*

In *Strickland v. Washington*, the Supreme Court set forth a two part test to guide courts in determining ineffective assistance claims. *See* 466 U.S. at 668, 104 S.Ct. 2052. This test applies to federal collateral proceedings. *Id.* at 697, 104 S.Ct. 2052. That same standard is used to evaluate ineffective assistance claims at the appellate stage. *See Smith v. Murray*, 477 U.S. 527, 535–36, 106 S.Ct. 2661, 2666–67, 91 L.Ed.2d 434 (1986). Because the same standard controls claims of ineffective assistance of counsel at both the trial and appellate stages, these two claims will be analyzed in conjunction.

Counsel can deprive a defendant of the right to effective assistance by failing to render adequate legal assistance. *See Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). To prevail on his claim that counsel's assistance was so ineffective as to require reversal of the conviction, petitioner must show that (1) counsel's performance was deficient, and (2) that deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The first component of the test requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *See id.* The standard for evaluating counsel's representation is one of ob-

jective reasonableness, and reasonableness is determined by evaluating the conduct from counsel's perspective at the time the events occurred, not in hindsight. *See id.* at 689, 104 S.Ct. 2052. Petitioner must "overcome the presumption that the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

The second component of the test requires a showing that the deficient performance deprived petitioner of "a trial whose result is reliable," *id.* at 687, 104 S.Ct. 2052, and accordingly, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. An error by counsel, therefore, will not warrant setting aside the judgement of the criminal proceeding if petitioner fails to make an affirmative demonstration of resulting prejudice. In making this determination, the court must look to the totality of the evidence before the jury. *See id.* at 695, 104 S.Ct. 2052.

 A court reviewing an ineffective assistance claim need not address both components of the inquiry if the petitioner fails to make a sufficient showing as to one. *See id* at 697, 104 S.Ct. 2052. The Supreme Court in *Strickland* voiced an explicit preference for "disposing of an ineffectiveness claim on the ground of insufficient prejudice." *Id.*

While the Supreme Court precedent is not wholly dispositive of the issue raised here by petitioner, it does set forth the parameters that must guide the Court's consideration. The Court will therefore determine whether the state court's action was reasonable in light of *Strickland.*

Petitioner claims that his trial counsel's assistance was ineffective because (1) he spent limited time with petitioner prior to trial and did not provide him with access to all documents; (2) failed to investigate the origin of the human head hair found in

Crowe's hand; (3) failed to obtain independent lab testing of blood stains on petitioner's mattress until after the close of the prosecution's evidence; (4) failed to move to suppress evidence of or object to admission of results of forensic testing on Nazzaro's car; (5) failed to object to introduction of "false" evidence, namely the testimony of Dr. Katakas regarding the toxicity tests and the needle and syringe identified as being found on petitioner's bed stand; (6) commenting to jury in closing argument that petitioner had stolen some scales; (7) failed to object to insufficient jury instructions.

The Appeals Court found that "[t]here has not been any showing of how the defendant was prejudiced .... none of the defendant's asserted deficiencies in the performance of his trial counsel individually, or in the aggregate, were 'likely to have made a difference in the result.'" *Huenefeld,* 34 Mass.App.Ct. at 321, 610 N.E.2d at 345–46 (quoting *Commonwealth v. Anderson,* 398 Mass. 838, 839, 501 N.E.2d 515 (1986)). This Court agrees.

 It cannot be said that counsel's decision to forgo investigation of the hair found in Crowe's hand was unreasonable, particularly since such investigation could have yielded inculpatory evidence. The Court has already determined that no harm befell petitioner as a result of the fact that his own hair was not analyzed. *See* discussion of Ground Three, *supra.* Additionally, the Court has also determined that (1) no prejudice resulted from the admission of the results of forensic analysis of evidence found in the car, *see* discussion of Ground Five, *supra;* (2) no harm resulted from the Dr.'s statement or the misidentification of the location of the needle and syringe upon seizure, *see* discussion of Ground Six, *supra;* and (3) there was no error in the jury instructions given by the judge, *see* discussion of Ground Two, *supra.* Based on these findings, petitioner has, *a fortiori,* failed to make a sufficient showing of prejudice as to these allegations of ineffectiveness.

■ For the reasons stated above, petitioner has also failed to demonstrate that he suffered prejudice as a result of the limited amount of time he spent with counsel prior to trial. He has made no showing that a different result would have been obtained had counsel spent more time with him, or provided access to certain documents.

■ Petitioner has also made no showing that he was prejudiced by counsel's decision to not obtain independent testing of the blood stains on the mattress until after the close of the evidence. This Court agrees with the Appeals Court who wrote, "that trial counsel chose not to risk possible inculpatory results until after the Commonwealth's evidence was presented to the jury appears to have been a reasonable tactical decision." *Id.* at 319, 610 N.E.2d 341.

■ Petitioner has also failed to make a sufficient showing that but for defense counsel's statement that "Huenefeld wanted to get rid of some scales that he stole," the result of the criminal proceeding would have been different. Gauging the effect of the comment in the context of the totality of the evidence before the jury, this Court finds no merit in petitioner's argument that the comment rises to the level of ineffective assistance.

Petitioner contests the assistance he received from his appellate counsel, and argues it was ineffective for the following reasons: (1) counsel did not meet with him to discuss the grounds for appeal; (2) did not provide him with access to documents related to the State's case or his convictions; (3) did not respond to petitioner's request to amend his appellate brief; (4) filed his first ALOFAR without giving notice to him; (5) failed to raise certain claims on direct appeal; and (6) deprived

him of the opportunity to file a *"Moffett"* brief pro se.

The Appeals Court found that petitioner failed to make out a claim of ineffective assistance of appellate counsel, "[a]ppellate counsel prepared and argued a comprehensive brief in this court on behalf of the defendant. Four issues were adequately argued. Principally the attack was on the judge's failure to instruct the jury on the effect of voluntary intoxication in determining the requisite intent required for the crime charged. . . . None of the forensic points now stressed by the defendant as appealable issues was a prominent feature at his trial." *Id.* at 321–22, 610 N.E.2d 341.

■ As to petitioner's first four arguments, he has failed to make a sufficient showing of prejudice resulting from counsels' actions. As to his argument that counsel failed to raise certain arguments on appeal, petitioner fails to recognize the function of appellate counsel. The purpose of having an appellate advocate is to weed out the weak arguments and emphasize the strong arguments. *See Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983). Petitioner has made no showing that he was in any way prejudiced by appellate counsel's strategic choice to bring certain challenges while jettisoning others.

■ Finally, *Commonwealth v. Moffett*[7] places further obligations on appellate counsel that exceed the rights provided to defendants under the Sixth Amendment. *See* 383 Mass. 201, 203, 418 N.E.2d 585, 589 (1981). Failure to comply with the *Moffett* rule which has its origins in state law does not raise a claim cognizable under federal habeas review. *See Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (citing *Lewis*

7. In *Moffett,* the Massachusetts Supreme Judicial Court expanded the holding in *Anders v. California,* 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967). Under *Moffett,* counsel requesting to be withdrawn from a case on grounds that the case lacks merit

must send a copy of the brief to the defendant explaining to the defendant that if he wishes to present additional arguments, he may do so within thirty days, and to certify to the court that the defendant has been notified. *See id.* at 208, 418 N.E.2d 585.

*v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3112, 111 L.Ed.2d 606 (1990)).

Petitioner's prayer for relief predicated on Grounds 10 and 12 are hereby DENIED.

*Ground 11 Deprivation of Due Process of Law and A Fair Trial by Cumulative Effect of Constitutional Defects and Errors That Occurred in the State Prosecution*

Petitioner argues that the alleged prosecutorial misconduct, use of "false" evidence, alleged attacks on counsel's character, comments on his silence, and the alleged misrepresentation of evidence had the cumulative effect of denying his right to a fair trial and due process of law. (Pet.Memo. at 41.) In light of the preceding findings made by this Court, *supra,* none of these asserted defects and errors either individually, or cumulatively had a "substantial and injurious effect or influence in determining the jury's verdict." *Abrahamson,* 507 U.S. at 637, 113 S.Ct. 1710. Petitioner has unfortunately conflated the concept of a perfect trial with that of a fair trial. "There can be no such thing as an error-free, perfect trial, and [ ] the constitution does not guarantee such a trial." *United States v. Hasting,* 461 U.S. 499, 508–9, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983); *see Lutwak v. U.S.* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953) ("A defendant is entitled to a fair trial but not a perfect one.").

Accordingly, petitioner's prayer for relief predicated on Ground 11 is hereby DENIED.

### VI. *Petitioner's Motion for Discovery Pursuant to Rule 6(a) of the Rules Governing § 2254 Cases*

 Rule 6(a) states: "A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to

do so, but not otherwise." 28 U.S.C. § 2254, Rule 6(a). A petitioner seeking habeas relief is not entitled to discovery as a matter of course. *See Bracy v. Gramley,* 520 U.S. 899, 904 117 S.Ct. 1793, 1796–1797, 138 L.Ed.2d 97 (1997).

 Petitioner requests admissions confirming the location of the syringe upon its seizure, interrogatories concerning the toxicological testing performed on the victim's body, specifically with regard to testing for presence of cocaine, and transcribed records of Nazzaro's interview with the police. As grounds, he sets forth the conclusory allegation that the requested materials will "demonstrate the blatantly false nature of physical evidence" that formed the basis for his conviction. This is not sufficient to demonstrate good cause. *See Harris v. Johnson* 81 F.3d 535 (5th Cir.1996), *cert. denied,* 517 U.S. 1227, 116 S.Ct. 1863, 134 L.Ed.2d 961 (1996). Petitioner has not made any showing of what he expects to find or how the discovery would assist him.

Moreover, this Court agrees with the respondent who argues that petitioner's request for admissions implicates an alleged discrepancy in the Commonwealth's evidence that has been addressed by the state court and is a matter of record. Further, based on this Court's preceding analysis of the Grounds for petitioner's application, petitioner neither alleges, nor can this Court discern, the existence of a factual dispute that would necessitate the requested discovery and which, if resolved in petitioner's favor, would warrant relief.

Accordingly, petitioner's Request for Leave to Exercise Discovery is hereby DENIED.

### VIII. *Need for Evidentiary Hearing*

Although neither party has requested an evidentiary hearing, the Court will address the matter briefly. 28 U.S.C. § 2254(e)(2) provides that

"If the applicant has failed to develop the factual basis of a claim in State court

**236**

proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) The claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense."

▮ Petitioner would be entitled to an evidentiary hearing only if the state court fact finding process was deficient in some significant respect. *See Eaton v. Angelone,* 139 F.3d 990, 994 (4th Cir.1998) (citing *Townsend v. Sain,* 372 U.S. 293, 312–13, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992)). This Court finds that the state court's fact finding process was not deficient in any significant respect. Federal courts sitting in habeas jurisdiction have been entrusted by the Supreme Court to preserve "the state trial on the merits [as] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing." *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). As the court in *Eaton* observed, "[w]e would be unfaithful to this charge if we acted to supplant the state fact-finding process with repetitive federal proceedings." *Eaton,* 139 F.3d at 995.

For these reason, this Courts finds that an evidentiary hearing pursuant to § 2254(e)(2) is not warranted.

Huenefeld's petition for a writ of habeas corpus is hereby DENIED, his request for discovery is DENIED, and an evidentiary hearing is not warranted.

SO ORDERED,